**CONSUMER LITIGATION ASSOCIATES, P.C.**
Craig C. Marchiando (SBN 283829)
Matthew J. Erausquin (SBN 255217)
700 South Flower Street, Suite 1000
Los Angeles, CA 90017
Tel: 703-273-7770
Fax: 888-892-3512
craig@clalegal.com
matt@clalegal.com

**CONSUMER LITIGATION ASSOCIATES, P.C.**
Leonard A. Bennett (*Pro Hac Vice*)
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
Tel: 757-930-3660
Fax: 757-257-3450
lenbennett@clalegal.com

**BERGER MONTAGUE PC**
Russell D. Paul (*Pro Hac Vice*)
Abigail J. Gertner (*Pro Hac Vice*)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
rpaul@bm.net
agertner@bm.net

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARA PELAYO, MILES AND OLIVIA MCGREGOR, SANDRA MORGAN, CHRISTINA AND SETH MARTIN, and DOROTHY RICE, individually, and on behalf of a class of similarly situated individual,<br><br>Plaintiffs,<br><br>v.<br><br>HYUNDAI MOTOR AMERICA, INC., HYUNDAI MOTOR COMPANY, KIA MOTORS AMERICA, INC. and KIA MOTORS CORPORATION | Case No.:  8:20-CV-01503-JLS-ADS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>(1)  Violation of California's Legal Remedies Act<br>(2)  Breach of Express Warranty<br>(3)  Breach of Implied Warranty<br>(4)  Fraud by Omission/Fraudulent Concealment<br>(5)  Unjust Enrichment<br>(6)  Violation of the Song-Beverly Consumer Warranty Act<br>(7)  Violation of California's Unfair Competition Law<br>(8)  Violation of the Florida Deceptive and Unfair Trade Practices Act<br>(9)  Breach of Warranty against |

1    Defendants.

Rehibitory Defects
(10) Violation of the Louisiana Products
      Liability Act
(11) Violation of the Missouri
      Merchandising Practices Act
(12) Violation of the Virginia Consumer
      Protection Act

**DEMAND FOR JURY TRIAL**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1.      Plaintiffs Sara Pelayo, Miles and Olivia McGregor, Sandra Morgan, Christina and Seth Martin and Dorothy Rice, ("Plaintiffs") bring this action for themselves and on behalf of all persons ("Class Members") in the United States, and in the alternative on behalf of all persons in the states of Florida, Missouri, and Virginia, who purchased or leased Hyundai or Kia brand vehicles with a "Gamma" 1.6L GDI engine ("Class Vehicles")[1].

2.      Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC") (together with HMA, "Hyundai"), Kia Motors America, Inc. ("KMA"), and Kia Motors Corporation ("KMC") (together with KMA, "Kia," and Kia collectively with Hyundai, "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

## INTRODUCTION

3.      This is a consumer class action concerning the misrepresentation of material facts, the failure to disclose material facts, and safety concerns to consumers.

4.      Defendants manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles possessed a defect which materially affects the ability of the vehicles to provide safe, reliable transportation.  Instead, the Class Vehicles are prone to stalling and engine fires while in motion, as well as excessive oil consumption and premature engine failure prior to the expected lifetime of the engine.

5.      Plaintiffs are informed and believe, and based thereon allege, that the Class Vehicles contain design, manufacturing, material, and/or workmanship

---

[1] Upon information and belief, these vehicles include: 2010-present Hyundai Accent; 2018 to present Hyundai Kona; 2010-2020 Hyundai Elantra; 2012 to present Hyundai Veloster; certain 2009 to present Hyundai Tucson; 2012 to present Kia Rio; 2010 to present Kia Soul; certain 2019-2020 Kia Forte; and certain 2017 to present Kia Sportage.

defects which cause sudden stalling, excessive oil consumption, and premature engine failure as well as catastrophic and fast-moving fires while the vehicles are being driven which destroy the vehicles, their contents and can harm the passengers therein (the "Defect").  Upon information and belief, the Defect is the result of sub-standard, inconsistent and improper procedures in manufacturing the Gamma engines, and/or poor quality-control procedures to ensure such engines do not reach consumers.  The Defect causes unsafe driving conditions because the Class Vehicles have a significantly greater chance of stalling, engine failure, or spontaneously bursting into flame while being driven.

6.     The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.

7.     Gamma GDI engines were first introduced in Hyundai and Kia vehicles in 2006.  They have become the standard engine for the small to midsize range of vehicles in both manufacturers' lineups.

8.     HMC and KMC designed and manufactured the Class Vehicles, as well as the engine, related powertrain components, and the software which controls these systems within the vehicles.  HMA and KMA marketed and distributed the Class Vehicles in the United States, as well as interfaced with consumers, and distributed service instructions, training, and updates to dealers.

9.     All of the Gamma engines are fuel injection engines, which is when the gasoline is injected into the engine itself instead of through a carburetor. Most of the Gamma engines on the road currently are gasoline direct injection ("GDI"), which injects gasoline directly into the combustion chamber. Some newer models of Gamma engines have indirect injection, or multipoint fuel injection ("MPI"), which injects gasoline into the intake ports upstream of each cylinder's intake valve.

FIRST AMENDED CLASS ACTION COMPLAINT

10.     Injection engines are exposed to more internal heat and pressure, which requires more precise manufacturing and engine-control software.  This is particularly true of GDI engines.  Such engines are also prone to the build-up of carbon residue, excessive oil consumption, and flash burns in the cylinders.[2]  In Gamma GDI engines, prior to bursting into flames, vehicles may stall unexpectedly while being driven, making ticking noises, and burn through multiple sparkplugs and ignition coils[3], as well as excessive amounts of oil, necessitating the addition of oil in between standard oil changes, as well as more frequent oil changes.

11.     Upon information and belief, Defendants decided to use Gamma MPI engines in 2020 model year vehicles, in part because they are less susceptible to spontaneously bursting into flame because the engines are subject to significantly less pressure and more forgiving of manufacture defects.

12.     Despite knowledge of the Defect and its dangerous associated safety risk, Defendants failed to issue a comprehensive and effective recall, fix the vehicles, and instead continued to sell vehicles with the Defect.

13.     The Defect presents a safety risk for Plaintiffs, other owners and lessees of Class Vehicles, and the general public because, upon information and belief, when the vehicles suddenly decelerate or stop in the middle of the road or highway, they subject themselves and other vehicles to a high risk of collision and personal injury, and when they burst into flames while being driven, they cause a direct threat to the lives of the passengers and surrounding vehicles and their passengers.

---

[2] Jones, Greg, "Solving Gasoline Direct Injection Issues: The facts and fictions of GDI," EngineBuilder, https://www.enginebuildermag.com/2017/10/solving-gasoline-direct-injection-issues-facts-fictions-gdi/ (Oct. 1, 2017).
[3] Spark plugs and ignition coils are parts which typically last around 100,000 miles in modern vehicles.

14.    In the United States, Defendants provide warranty coverage for Class Vehicles under one or more warranties.  Both provide a New Vehicle Basic Warranty, which provides bumper-to-bumper coverage for 5 years or 60,000 miles and a Powertrain Limited Warranty for powertrain components for 10 years or 100,000 miles.  HMA calls this "America's Best Warranty."[4]

15.    Based on pre-production testing and design failure mode analysis, quality control audits, early complaints to dealers and warranty claims, dealer audits, replacement part orders, Service Bulletins and complaints made to Defendants HMA, KMA, and NHTSA, Defendants were aware of the Defect in Class Vehicles as early as 2009 but continued to misrepresent the ability of the Class Vehicles to  provide safe, reliable transportation, and further concealed the Defect and its effects from Plaintiffs and other owners and/or lessees of Class Vehicles.

16.    Because the Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and other owners and/or lessees of Class Vehicles, Defendants were required to repair the Class Vehicles under the terms of the warranties free of charge.  Yet, on information and belief, Defendants have failed to permanently repair or replace the defective parts free of charge under the warranties because Defendants have failed to acknowledge the scope and extent of the Defect.

17.    Instead, Defendants have engaged in piecemeal, half-measures in attempting to remediate the Defect, in an attempt to reduce their costs of repair, wrongfully transfer the remaining cost to Plaintiffs and members of the Class, and to conceal the true nature, cause and extent of the Defect in Class Vehicles.

18.    Knowledge and information regarding the Defect and the associated safety risk were in the exclusive and superior possession of Defendants and their

---

[4] *See* https://www.hyundaiusa.com/us/en/assurance/america-best-warranty

authorized dealers and were not provided to Plaintiffs and other owners and/or lessees of the Class Vehicles, who could not reasonably discover the Defect through due diligence.  Despite Defendants' knowledge, Defendants continue to sell these defective vehicles, have failed to disclose the existence of the Defect to directly to consumers, Plaintiffs and other owners and/or lessees of Class Vehicles, have not issued a full, comprehensive and effective recall and have not remedied the Defect and/or compensated Class Vehicle purchasers, owners, or lessees for this material defect.

19.    The nature of the Defect is such that it manifests both within and outside the warranty periods, and excessive oil consumption, premature engine failure, stalling and fires can occur in brand-new vehicles as well as vehicles that have been on the road for years.  Because knowledge and information about the existence and scope of the Defect was within the exclusive and superior possession of Defendants and their authorized dealers, Defendants concealed this information in order to continue to sell more Class Vehicles and to wrongfully transfer costs of repair or replacement to Plaintiffs and other owners and/or lessees of Class Vehicles.

20.    No reasonable consumer expects to purchase or lease a vehicle that contains a Defect which creates a safety hazard that causes the vehicle to shutdown, stall or burst into flames while being driven.  The Defect is material to Plaintiffs and other owners and/or lessees of Class Vehicles because when they purchased or leased their Class Vehicles, they reasonably expected that they would be able to drive the vehicles without the engines failing, stalling or bursting into flame.  Had Defendants disclosed the Defect, Plaintiffs and other owners and/or lessees of Class Vehicles would not have purchased or leased their Class Vehicles, or would have paid less for their Class Vehicles.

**THE PARTIES**

**Plaintiff Sara Pelayo**

21.     Plaintiff Sara Pelayo is a California citizen who resides in Wildomar, California.

22.     In or around August 2016, Pelayo purchased a new 2016 Hyundai Accent from Temecula Hyundai, an authorized Hyundai dealer in Temecula.

23.     Plaintiff Pelayo purchased her Hyundai Accent vehicle primarily for personal, family, or household use.

24.     The safety and reliability of the vehicle were important factors in Pelayo's decision to purchase her vehicle. Before making her purchase, she reviewed the Hyundai brochure for the Accent as well as the Monroney Sticker or "window sticker" which listed official information about the vehicle. Pelayo believed that the Hyundai Accent would be a safe and reliable vehicle.

25.     Hyundai's misstatements and omissions were material to Pelayo. Had Hyundai disclosed its knowledge of the Defect before Pelayo purchased her Accent, Pelayo would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Pelayo would not have purchased her vehicle or would have paid less for it.

26.     Pelayo properly maintained her 2016 Hyundai Accent, in particular, making sure oil changes and routine service were timely.

27.     On or about July 24, 2020, Pelayo was driving her vehicle and attempting to enter a freeway when the engine suddenly stalled.  She called the American Automobile Association, which helped her to restart her car so she could get home.

28.     The next day, Pelayo attempted to drive her vehicle again. As she was driving, the vehicle began to stall once more and also began to produce strange noises she had not heard before. She pulled the vehicle over and noticed

white smoke coming from underneath the hood, which soon turned to black smoke. She and her passengers immediately exited the vehicle and, upon seeing flames beneath the vehicle, called 911.

29.    The resulting inferno was horrific:



1
2

30.  Both police and the fire department responded to the vehicle fire, but the vehicle was destroyed by the blaze.

3
4
5

31.  There was no indication from the vehicle via warning lights or sounds that there was a problem with the vehicle's engine prior to the stall or the fire.

6
7

32.  Due to the extent of the damage caused by the fire and water, the vehicle was classified as a total loss.

8
9
10
11
12
13
14
15
16
17



18
19
20
21
22
23
24
25
26
27



28

FIRST AMENDED CLASS ACTION COMPLAINT

33.     At all times, Plaintiff Pelayo, like all Class Members, attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiffs Miles and Olivia McGregor**

34.     Plaintiffs Miles and Olivia McGregor ("the McGregors") are Florida citizens who reside in Naples, Florida.

35.     In or around August 2014, the McGregors purchased a new 2015 Kia Rio from Airport Kia, an authorized Kia dealer in Naples, Florida.

36.     The McGregors purchased their Kia Rio vehicle primarily for personal, family, or household use.

37.     The safety and reliability of the vehicle were important factors in the McGregor's decision to purchase their vehicle. After hearing a radio commercial about the vehicle, the McGregors went to Airport Kia.  Before making their purchase, they reviewed the Kia brochure for the Rio as well as the Monroney Sticker or "window sticker" which listed official information about the vehicle. The McGregors believed that the Kia Rio would be a safe and reliable vehicle.

38.     Kia's misstatements and omissions were material to the McGregors. Had Kia disclosed its knowledge of the Defect before the McGregors purchased their Rio, the McGregors would have seen and been aware of the disclosures. Furthermore, had they known of the Defect, the McGregors would not have purchased their vehicle or would have paid less for it.

39.     The McGregors properly maintained their 2015 Kia Rio, in particular, making sure oil changes and routine service were timely.

40.     On or about June 25, 2020, Plaintiff Olivia McGregor was driving on Interstate 75 southbound near mile marker 182.  Her two-year-old son and she were returning home from a visit to her parents in Tennessee.  As a result, they had many of their possessions in the car, including her son's car seat, clothing,

medication including her EpiPen, her son's tablet and scooter, as well as all of the toys and sensory items for her son who is on the autism spectrum.  The value of these items were hundreds of dollars.

41.    As she was driving, Plaintiff Olivia McGregor heard a "pop" from the direction of her engine.  Almost immediately thereafter, smoke began to pour from the hood of her 2015 Kia Rio.  She immediately pulled over and grabbed her son from the car.

42.    Within moments, flames engulfed the engine compartment and driver's area of the car.  She called for emergency help and both the police and the North Port Fire Department arrived within minutes.

43.    By the time emergency services arrived, the vehicle was "fully involved" in the fire. The North Port Fire Department used 500 gallons of water to extinguish the fire, causing further damage to the vehicle.  The photograph below was posted by the North Port Police Department on its Instagram account and is of the McGregor's vehicle engulfed in flames during the incident described above.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24
25
26
27
28

44.     The North Port Fire Department Battalion Chief, John Waligora, stated in the incident report that the fire originated under the hood and moved its way back to the passenger compartment.  He also stated that the "[c]ause appeared to be mechanical in nature."

45. There was no indication from the vehicle via warning lights or sounds that there was a problem with the vehicle's engine.

46. Due to the extent of the damage caused by the fire and water, the vehicle was classified as a total loss.



47. At all times, Plaintiffs Miles and Olivia McGregor, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiff Sandra Morgan**

48.     Plaintiff Sandra Morgan is a Louisiana citizen who resides in Collinston, Louisiana.

49.     On or about August 6, 2019, Plaintiff Morgan purchased a new 2019 Kia Rio from Sparks Nissan Kia, an authorized Kia dealer located in Monroe, Louisiana.

50.     Plaintiff Morgan purchased her 2019 Kia Rio vehicle primarily for personal, family, or household use.

51.     The safety and reliability of the vehicle were important factors in the Morgan's decision to purchase her vehicle. Before making her purchase, she reviewed the Kia brochure for the Rio as well as the Monroney Sticker or "window sticker" which listed official information about the vehicle. Plaintiff Morgan believed that the Kia Rio would be a safe and reliable vehicle.

52.     Kia's misstatements and omissions were material to Plaintiff Morgan. Had Kia disclosed its knowledge of the Defect before Morgan purchased her Rio, Morgan would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Morgan would not have purchased her vehicle or would have paid less for it.

53.     Plaintiff Morgan properly maintained her 2019 Kia Rio, in particular, making sure oil changes and routine service were timely.

54.     On January 12, 2020, Plaintiff Morgan drove from her home to the Loch Arbor Baptist Church in Monroe, Louisiana.  She pulled into the parking lot, turned off the engine, and was gathering her belongings when she thought she smelled smoke. Bystanders in the parking lot then warned her that her vehicle was on fire.  As the fire was visible moments after Plaintiff Morgan turned off the engine, the fire appeared to have started while her vehicle was in motion.

55.     Plaintiff Morgan managed to get out of her vehicle safely and the pastor of her church used a fire extinguisher to put out the fire and extinguished the flames which had engulfed the engine.  When the fire department arrived, they verified that the fire had been put out.

56.     There was no indication from the vehicle via warning lights or sounds that there was a problem with the vehicle's engine.



57.     Due to the extent of the damage caused by the fire and foam, the vehicle was classified as a total loss.

58.     At all times, Plaintiff Morgan, like all Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

**Plaintiffs Christina and Seth Martin**

59.     Plaintiffs Christina and Seth Martin ("the Martins") are Missouri citizens who reside in Independence, Missouri.

60.     On or around August 22, 2016, the Martins purchased a new 2016 Kia Soul from Bob Sight Independence Kia, an authorized Kia dealer in Independence, Missouri.

61.     The Martins purchased their Kia Soul vehicle primarily for personal, family, or household use.

62.     The safety and reliability of the vehicle were important factors in the Martins' decision to purchase their vehicle. Before making their purchase, they reviewed the Kia brochure for the Soul as well as the Monroney Sticker or "window sticker" which listed official information about the vehicle. The Martins believed that the Kia Soul would be a safe and reliable vehicle.

63.     Kia's misstatements and omissions were material to the Martins. Had Kia disclosed its knowledge of the Defect before the Martins purchased their Soul, they would have seen and been aware of the disclosures. Furthermore, had they known of the Defect, the Martins would not have purchased their vehicle or would have paid less for it.

64.     The Martins properly maintained the 2016 Kia Soul, in particular, making sure oil changes and routine service were timely.  In addition, in 2018, the Martins received notice of a recall from Kia and promptly took their vehicle to the dealership, which performed a software update and informed them they were "good to go."

65.     In or around March 2018, while the vehicle was being driven, the check-engine light illuminated and the car immediately stopped accelerating past 30 miles per hour.  The Martins took their vehicle to Bob Sight Kia for diagnosis and repair.  The catalytic converter was replaced.

66.     In or around January 2020, the Martins again experienced the check-engine light illumination and the car being unable to accelerate past 30 miles per hour.  Once again, they took the vehicle to Bob Sight Kia for diagnosis and repair, and once more, the catalytic converter was replaced.

67.     On or around June 4, 2020, the check-engine light in their vehicle illuminated again while being driven.  They took the vehicle to Bob Sight Kia for diagnosis and repair, where they were informed that the entire engine needed to be replaced.  The dealership kept their vehicle for approximately two weeks and installed a remanufactured engine.

68.     The day the Martins picked up their vehicle, the check-engine light illuminated and the vehicle was unable to accelerate past 30 miles per hour.  They immediately returned the vehicle to the dealership.

69.     After about another week, the dealership informed the Martins that the fuel regulator in their vehicle needed to be cleaned and was not "on" correctly.  The dealership cleaned and fixed the fuel regulator.  After performing a 20-mile test drive, the dealership assured the Martins that their vehicle was repaired and had no problems.

70.     On or about July 2, 2020, the Martins went to Bob Sight Kia to pick up the vehicle.  On the way home from the dealership, Seth Martin was driving and Christina Martin was in the passenger seat.  They dropped off their son and were on their way home in a residential neighborhood, at East 35th Street and South Hardy Avenue, driving approximately 30 miles per hour, when a pedestrian began to wave his hands wildly to get their attention.  Christina Martin rolled down her window and the pedestrian yelled, "Fire!"  At that point, the Martins realized that their vehicle was on fire.

71.     Flames from the engine compartment quickly began to envelop the car while it was still moving.  Seth Martin turned the vehicle onto another street and tried to pull over, while Christina Martin tried to open her door to get out since the car was moving so slowly.  As the door opened, the flames shot up and she felt the heat on her arms and she was trapped.  Seth Martin managed to get his door open and grabbed her, and they both exited the vehicle from the driver's side.  This was captured on video by the surveillance camera on a local residence:



72.     Immediately after managing to exit the vehicle, Martin heard a big "pop" and then three very loud "booms" as the car was engulfed in flames.

73.     The Independence Fire Department arrived on scene within minutes of fire.  When they arrived, the vehicle's engine compartment was "fully involved" in the fire.



74.   The incident report states that the "engine area, running gear" is the area of fire origin.  The cause of the fire is undetermined after investigation.

1  75.   There was no indication from the vehicle via warning lights or

2  sounds that there was a problem with the vehicle's engine immediately prior to

3  the fire's start.

4  76.   Christina Martin contacted her vehicle's insurance company, who

5  refused to take her claim and informed her that she needed to speak with Kia

6  about the issue.

7  77.   The Martins had the vehicle towed to Bob Sight Kia, which did not

8  want the vehicle on its lot where consumers could view it.  It was removed to

9  Bob Sight Ford in Summit, Missouri.  The dealership also told the Martins to

10  contact Kia consumer affairs, which they did.

11  78.   At all times, Plaintiffs Christina and Seth Martin, like all Class

12  Members, have attempted to drive their vehicle in a foreseeable manner and in

13  the manner in which it was intended to be used.

14  **Plaintiff Dorothy Rice**

15  79.   Plaintiff Dorothy Rice is a citizen of Virginia and resides in

16  Madison Heights, Virginia.

17  80.   On or about August 23, 2019, Dorothy Rice purchased a new Kia

18  Rio sedan from Kia of Lynchburg, located at 3400 Old Forest Road, Lynchburg,

19  Virginia.

20  81.   Plaintiff Rice purchased her 2019 Kia Rio vehicle primarily for

21  personal, family, or household use.

22  82.   The safety and reliability of the vehicle were important factors in the

23  Rice's decision to purchase her vehicle. Before making her purchase, she

24  reviewed the Kia brochure for the Rio as well as the Monroney Sticker or

25  "window sticker" which listed official information about the vehicle. Plaintiff

26  Rice believed that the Kia Rio would be a safe and reliable vehicle.

27

28

83.     Kia's misstatements and omissions were material to Plaintiff Rice. Had Kia disclosed its knowledge of the Defect before Rice purchased her Rio, Rice would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Rice would not have purchased her vehicle or would have paid less for it.

84.     Plaintiff Rice properly maintained her 2019 Kia Rio, in particular, making sure oil changes and routine service were timely.

85.     On or about December 23, 2019, Plaintiff Rice's grandson, Tyrik Simmons, drove the vehicle from Culpepper, Virginia to the Charlottesville, Virginia, area.  While driving, he heard a ticking noise, pulled the vehicle over, and shut it off.  After waiting a moment, he restarted the vehicle and continued his drive on Route 29 South after the ticking sound did not reappear.

86.     The ticking sound returned as Mr. Simmons reached Lovington, Virginia, growing louder until he heard what sounded like an object falling from the vehicle onto the road.

87.     Almost immediately thereafter, Mr. Simmons observed flames emanating from below the vehicle.  He managed to pull over and get out of the vehicle without injury.

88.     The Amherst County Fire Department responded to the scene of the "fully involved" vehicle fire.  The fire department extinguished the fire with water, causing additional damage to the vehicle and its contents.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18        89.    An oil slick left by the vehicle spread fifty yards along the left lane
19   of Route 29 South near the site of the fire, necessitating the application of
20   absorbent treatment to remove the excess oil.  The fire department also recovered
21   an engine part resembling the top of an engine piston from the oil slick.
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19



The piston that fell out my brother car && caused it to catch on fire

20      90.     The Amherst County Public Safety Fire Marshall, Samuel A.

21  Bryant, IV, stated in his incident report that the fire originated in the engine bay

22  of the vehicle and was caused by a mechanical failure of the engine.  The most

23  damaged portions of the vehicle were the engine compartment and the driver

24  occupant area, including the driver's seat.

25      91.     The trunk area was damaged extensively by the heat of the fire,

26  melting the Christmas presents inside, valued in excess of $2,500.

27
28

92.     There was no indication from the vehicle via warning lights or sounds that there was a problem with the vehicle's engine.

93.     Due to the extent of the damage caused by the fire and water, the vehicle was classified as a total loss.

94.     At all times, Plaintiff Rice, like all Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used.

95.     Plaintiffs and each other Class member's ascertainable losses include, but are not limited to, out-of-pocket losses by overpaying for the vehicles at the time of purchase and repair costs, decreased performance of the vehicles, loss of use of the vehicles, loss of items destroyed by the fires, and diminished value of the vehicles. Accordingly, Plaintiffs bring claims individually and as representatives of the Class.

**Defendant Hyundai Motor America, Inc.**

96.     Defendant Hyundai Motor America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. HMA is headquartered in Fountain Valley, California and is a wholly owned subsidiary of HMC.

97.     HMA is responsible for sales, marketing, service, distribution, import and export of Hyundai branded products, including vehicles and parts, in the United States. HMA is also the warrantor and distributor of Hyundai vehicles, including the Class Vehicles, throughout the United States.  HMA is a wholly owned subsidiary of HMC.

98.     In order to sell vehicles to the general public, HMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs.  In return for the exclusive right to sell new Hyundai branded vehicles, authorized dealerships are also permitted to service

and repair these vehicles under the warranties HMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Hyundai instructions, issued through service manuals, technical service bulletins ("TSBs") and other documents. Per the agreements between HMA and the authorized dealers, consumers such Plaintiffs are able to receive services under HMA's issued warranty at dealer locations which are convenient to them. These agreements provide HMA with a significant amount of control over the actions of the authorized dealerships. For example, HMA employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.[5]

99.    Upon information and belief, HMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Hyundai Class Vehicles.

**Defendant Hyundai Motor Company**

100.    Defendant Hyundai Motor Company is a corporation founded in 1967 under the laws of South Korea and headquartered in Seoul, South Korea.

101.    HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States.

102.    HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing in Alabama and the technical campus in Michigan. For all its United States subsidiaries, including HMA,

---

[5] *See, e.g.*, https://www.hyundainews.com/en-us/releases/2135 ("Hyundai Motor America named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships across the 12 Western-most states in the United States.").

1   HMC provides all the technical information for the purposes of manufacturing,

2   servicing, and repairing the Class Vehicles

3       103.   Upon information and belief, the decision to found HMA in

4   California and register it as a California corporation was made by HMC.

5       104.   Upon information and belief, the relationship between HMA and

6   HMC is governed by an agreement that gives HMC the right to control nearly

7   every aspect of HMA's operations—including sales, marketing, management

8   policies, technical information, servicing instructions, governance policies,

9   pricing, and warranty terms.  Furthermore, HMC exercises control over the

10  executives in charge of HMA, including appointing the President and CEO of

11  HMA, Jose Munoz.  In addition to this role, Mr. Munoz is also the Global Chief

12  Operating Office of HMC.[6]

13  **Defendant Kia Motors America, Inc.**

14      105.   Defendant Kia Motors America, Inc. is a corporation organized and

15  in existence under the laws of the State of California and registered to do

16  business in the State of California. KMA is headquartered in Irvine, California

17  and is a wholly owned subsidiary of KMC.

18      106.   KMA is responsible for sales, marketing, service, distribution,

19  import and export of Kia branded products, including vehicles and parts, in the

20  United States. KMA is also the warrantor and distributor of Kia vehicles,

21  including the Class Vehicles, throughout the United States.

22      107.   In order to sell vehicles to the general public, KMA enters into

23  agreements with authorized dealerships who engage in retail sales with

24  consumers such as Plaintiffs.  In return for the exclusive right to sell new Kia

25  branded vehicles, authorized dealerships are also permitted to service and repair

26  these vehicles under the warranties KMA provides directly to consumers who

27

28  [6] *See* https://www.hyundainews.com/en-us/bios/jose-munoz.

purchased new vehicles from the authorized dealerships.  All service and repair at an authorized dealership is completed according to Kia instructions, issued through service manuals, TSBs and other documents.  Per the agreements between KMA and the authorized dealers, consumers such Plaintiffs are able to receive services under KMA's issued warranty at dealer locations which are convenient to them.  These agreements provide KMA with a significant amount of control over the actions of the authorized dealerships.  As with HMA, KMA also employs region managers whose responsibilities include managing the dealers within their region, including marketing and customer satisfaction initiatives.

108.   Upon information and belief, KMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Kia Class Vehicles.

**Defendant Kia Motor Company**

109.   Defendant Kia Motor Company is a corporation founded in 1944 under the laws of South Korea and headquartered in Seoul, South Korea.

110.   KMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Kia-branded vehicles and parts for those vehicles worldwide, including the United States.

111.   KMC is the parent corporation of KMA, as well as the United States based Kia facilities, including manufacturing in Georgia.  For all its United States subsidiaries, including KMA, KMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles.

112.   Upon information and belief, the decision to found KMA in California and register it as a California corporation was made by KMC.

113.   Upon information and belief, the relationship between KMA and KMC is governed by an agreement that gives KMC the right to control nearly

1   every aspect of KMA's operations—including sales, marketing, management

2   policies, technical information, servicing instructions, governance policies,

3   pricing, and warranty terms.

4       114.   Defendants, through their various entities, design, manufacture,

5   market, distribute, service, repair, sell, and lease passenger vehicles, including

6   the Class Vehicles, nationwide and in California, Florida, Missouri, and Virginia.

7       115.   Defendants HMC and KMC worked together to develop, design,

8   manufacture, test, and draft technical materials for the Class Vehicles and the

9   Gamma engines.  In fact, HMC and KMC are controlled by the same parent,

10  Hyundai Motor Group, and the chairman of the board of both companies is Eui-

11  sun Chung.

12      116.   Defendants worked together on the drafting and distribution of all

13  advertising materials and technical bulletins regarding the Class Vehicles to

14  authorized dealers, as well as in training Hyundai and Kia-dealer technicians in

15  the correct procedures to maintain, service, and repair Hyundai and Kia vehicles.

16      117.   At all relevant times, Defendants were and are engaged in the

17  business of designing, manufacturing, constructing, assembling, marketing,

18  distributing, and selling automobiles and motor vehicle components in California

19  and throughout the United States of America.

20                              **JURISDICTION**

21      118.   This is a class action.

22      119.   Members of the proposed Class number more than 100 and at least

23  one plaintiff and one defendant are citizens of different states.  On information

24  and belief, aggregate claims of individual Class Members exceed $5,000,000.00

25  in value, exclusive of interest and costs.

26      120.   Accordingly, jurisdiction is proper in this Court pursuant to 28

27  U.S.C. § 1332(d).

28

121.   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

**VENUE**

122.   Defendants, through their businesses of marketing, distributing, selling, and leasing the Class Vehicles, have established sufficient contacts in this District such that personal jurisdiction is appropriate. Hyundai and Kia are deemed to reside in this District pursuant to 28 U.S.C. § 1391(a).

123.   Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because this is a Judicial District in which the Defendants reside and in which a substantial part of the events or omissions giving rise to the claims occurred.

**FACTUAL ALLEGATIONS**

124.   Hyundai and Kia manufactured and sold defective Gamma GDI engines and then failed to disclose the Defect for years, concealing the true nature of the engines and vehicles from consumers, who—unbeknownst to them—were driving vehicles that had serious safety-related defects because they could stall at any moment and/or burst into flames.

125.   HMC and KMC designed and manufactured the Class Vehicles, including their engines, and HMA and KMA imported, distributed, marketed, warranted, and/or sold the Class Vehicles in the United States.  HMA and KMA also provide service and maintenance for the Class Vehicles through its extensive network of authorized dealers and service providers nationwide, using information provided by HMC and KMC.  Defendants have sold, directly or indirectly, though dealers and other retail outlets, millions of Class Vehicles in California, Florida, Missouri, Virginia, and nationwide in total.  In 2019, Hyundai had $23.2 billion in worldwide sales revenue.[7]  In 2019, Kia had $13.4

---

[7] *See* Hyundai Motor Announces 2019 Fourth-Quarter Business Results (Jan. 22, 2020, available at https://www.hyundai.com/worldwide/en/company/news/news-room/news/hyundai-motor-announces-2019-fourth-quarter-business-results-0000016391.

billion in worldwide sales revenue, approximately 35% of which is attributable to North American sales. [8]

126.   Kia and Hyundai developed the Gamma engine as an updated version of their own "Alpha" engine.  The Gamma engine was designed to specifically produce more power on less fuel, so that Kia and Hyundai would be able to meet government fuel efficiency standards.



127.   In addition to have having direct injection of the fuel into the combustion chamber, all Gamma GDI engines also use Constant Variable Valve Timing (CVVT) to control the flow of intake and exhaust gases into and out of the combustion chamber.  The CVVT in the Gamma engines is designed to optimize fuel economy and engine performance by mandating the timing of the lift of the valves relative to the position of the crankshaft during intake and exhaust cycles.

128.   Like all GDI engines, the Gamma engines in Class Vehicles are subject to significantly higher pressure while in operation.  The pressure in the GDI design is increased in the Gamma engines due to their relatively smaller

---

[8] *See* Kia Motors 2019 Business Results dated January 22, 2020 (available at https://pr.kia.com/en/company/ir/ir-library/business-results.do).

size compared to other 4-cylinder GDI engines.  Moreover, because the GDI design requires the fuel valve to spray atomized fuel directly into the combustion chamber, the software of the engine control unit ("ECU") must be carefully designed and calibrated.

129.   As a result, the manufacturing, assembly, and quality control processes for producing and installing these engines must be both precise and robust, to minimize if not eliminate the possibility of impurities contaminating the production of the engine components and manufacturing errors from occurring.  Failure to do so can lead to engines which produce excessive pressure, vibration, and/or heat when running, from the increased friction of the moving engine pieces.  At a minimum, these issues can damage other engine components, notably sensors, spark plugs, ignition coils, and the catalytic converter. Often the increased friction also leads to burning oil (excessive oil consumption), and, in the worst cases, tremendous wear on the pistons and cylinder walls which can lead to holes being produced in the metal and even engine fires.

130.   A few years after the Gamma engine was first introduced, both Hyundai and Kia had to scale-up operations to meet increasing demands for their products.[9]

131.   However, upon information and belief, as Hyundai and Kia production and sales ramped up, the quality of the workmanship in manufacturing the engines, including but not limited to their components such as the engine blocks, pistons, and bearings, to design specifications and in programming the control modules, suffered.

132.   Many of these issues are discoverable in quality-control inspections

---

[9] *See, e.g.*, https://www.industryweek.com/leadership/companies-executives/article/21937083/kia-motor-to-build-first-us-plant-in-georgia; https://www.autocar.co.uk/car-news/industry/hyundai-and-kia-ramp-car-build.

1  of components and engine manufacture.  Such inspections are routine, to ensure
2  that manufactured pieces meet design specifications.  Failure to meet these
3  specifications leads to components which fail to fit together properly, break
4  down, and are prone to damage themselves and other engine components, and
5  cause the Defect.   Despite this, the inspections done by Hyundai and Kia have
6  failed to prevent defective Gamma GDI engines from being installed in the Class
7  Vehicles.

8      133.   Upon information and belief, Gamma GDI engines in Hyundai and
9  Kia branded vehicles are subject to the Defect and its associated safety risk,
10 namely the excessive oil consumption, stalling, premature engine failures, and
11 engine fires which result when driving.

12     134.   In fact, over 3,000 reports of fires in Hyundai and Kia-branded
13 vehicles prompted NHTSA to open a formal investigation into the over 3 million
14 Hyundai and Kia vehicles, many of which carried the Gamma GDI engine.[10]

15     135.   Because the Defect is the result of widespread quality and
16 production problems, Hyundai and Kia are unwilling and/or unable to invest the
17 time and money to upgrade their production lines and fix the Defect in the
18 millions of vehicles.

19     136.   Instead, Defendants have engaged in a series of piecemeal recalls
20 and service campaigns to distribute largely ineffective fixes which fail to fully
21 repair the Defect.

22 **Defendants' Knowledge of the Defect**

23     137.   Plaintiffs are informed and believe, and based thereon allege, that
24 before Plaintiffs purchased their Class Vehicles, and since at least 2009 if not
25 substantially earlier, Defendants knew about the Defect through sources not
26 available to consumers, including the following: pre-release testing data; pre-

27 _____
   [10] https://www.caranddriver.com/news/a27053460/nhtsa-investigation-hyundai-
28 kia-fires/

release quality control data; pre-sale quality control audits; post-sale audits of quality; early consumer complaints about the Defect to Defendants' dealers who are their agents for vehicle repairs; warranty-claims data related to the Defect; aggregate data from Hyundai and Kia dealers; consumer complaints to NHTSA and resulting notice from NHTSA; early consumer complaints on websites and internet forums; dealership repair orders; testing conducted in response to owner and lessee complaints; and other internal sources of aggregate information about the problem.

138.  Further, even prior to bringing the Class Vehicles to market, Defendants were cognizant of the difficulty of manufacturing the quantity of Gamma engines needed to meet demand with the quality needed per the engine's GDI design, including but not limited to properly machining components and correctly calibrating the engine control unit which controls the fuel injection into the combustion chamber.

139.  In fact, Defendants have been sued previously for personal injuries suffered by owners and their passengers of vehicles with Gamma engines.  *See, e.g., Ayala v. Kia Motor Corporation*, No. 3:19-cv-01150 (D. P.R.) (child died as a result of a fire in a 2016 Kia Rio); "Lawsuit filed rented Kia Soul caught fire on the H-3, severely burning driver," *Hawaii News Now* (August 13, 2019) (driver suffered third-degree burns as a result of a fire in 2019 Kia Soul).

140.  Over the years that Gamma GDI engines have been in production, Hyundai and Kia have received an overwhelming number of warranty repairs, for complaints related to excessive oil consumption, stalling, loss of engine power, spark plug failure, and check engine lights.  Often, the following codes have been found: P0300 (random multiple misfire); P0301 (Cylinder #1 misfire); P0302 (Cylinder #2 misfire); P0303 (Cylinder #3 misfire); P0304 (Cylinder #4 misfire); P0441 (incorrect canister valve purge flow); and P0420 (catalytic

converter not operating properly).  These complaints have led to ECU reprogramming, but also spark plug, purge control solenoid valve (the valve which controls the passage of fuel tank vapors to the intake manifold), coil, cylinder, piston, catalytic converter and/or O2 sensor, short and long block engine assembly replacements, and even full engine replacements depending on the severity of the Defect in a particular engine and the damage it has done.  As a result, upon information and belief, there were often part shortages, particularly of the engine blocks, as these parts were needed in cars already on the road as well as in vehicles that were being manufactured.

141.   Because of this avalanche of warranty repairs, Hyundai and Kia instituted several ways to keep warranty repairs, and their costs, down.  One was to disclaim the warranty repair if the consumer had gotten routine service, like oil changes, from non-dealer mechanics, despite no requirement for all service to be by an authorized dealer appearing in the warranty terms.  Another was to claim that there might be an issue with crank position sensor (the sensor which monitors the position and speed of the crank shaft), which could cause intermittent stalling issues without prompting a code in the ECU.  However, Hyundai, Kia, and their authorized dealers did not tell consumers that crank position sensors can be damaged by excessive engine heat, a symptom of the Defect.

142.   Complaints that Class Vehicles' owners and lessees filed with NHTSA demonstrate that the defect is widespread and dangerous and that it manifests without warning.  The complaints also indicate Defendants' awareness of the problems with the Gamma GDI engines and how potentially dangerous the defect is for consumers. Attached hereto as **Exhibit A** is just a sampling of scores safety-related complaints that describe the Defect in Class Vehicles (spelling and grammar mistakes remain as found in the original) (Safercar.gov,

1  *Search for Complaints* (July 8, 2020),

2  http://www.odi.nhtsa.dot.gov/complaints/).

3      143.  HMA and KMA monitor customers' complaints made to NHTSA.

4  Federal law requires automakers like Hyundai and Kia to be in close contact with

5  NHTSA regarding potential automobile defects, including imposing a legal

6  requirement (backed by criminal penalties) compelling the confidential

7  disclosure of defects and related data by automakers to NHTSA, including field

8  reports, customer complaints, and warranty data.  *See TREAD Act*, Pub. L. No.

9  106-414, 114 Stat. 1800 (2000).

10      144.  Automakers have a legal obligation to identify and report emerging

11  safety-related defects to NHTSA under the Early Warning Report Requirements.

12  *Id.*  Similarly, automakers monitor NHTSA database for consumer complaints

13  regarding their automobiles as part of their ongoing obligation to identify

14  potential defects in their vehicles, including safety-related defects.  *Id.*  HMA is

15  HMC's agent to interface with NHTSA to monitor complaints, respond to

16  inquiries, conduct recalls, and assist NHTSA with investigations.  KMA is

17  KMC's agent to interface with NHTSA for the same tasks.  Thus, Hyundai and

18  Kia knew or should have known of the many complaints about the Defect logged

19  by the NHTSA Office of Defect Investigation (ODI), and the content,

20  consistency, and large number of those complaints alerted, or should have

21  alerted, Defendants to the Defect.

22      145.  Also, complaints posted by consumers in internet forums

23  demonstrate that the Defect is widespread and dangerous and that it manifests

24  without warning. The complaints also indicate Defendants' awareness of the

25  problems with the Gamma engine and how potentially dangerous the Defect is

26  for consumers. These complaints are listed on **Exhibit B** attached hereto.

27  Hyundai and Kia consumer relations department and/or online reputation

28

management services acting on their behalf routinely monitor the internet for such complaints about its products, including complaints posted on consumer forums.  These posts describe the Defect.  The fact that so many customers made similar complaints would have Hyundai and Kia on notice that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the Class Vehicles.

146.   In fact, both Hyundai and Kia have instituted service campaigns and/or recalled some of the vehicles due to problems with the Gamma GDI engine.

147.   In May 2009, Kia issued a TSB for all models of its vehicles with Continuous Variable Valve Timing ("CVVT"), including 2010 MY Soul with Gamma 1.6L engines.   This was related to the Oil Control Valve which was used in the CVVT.  The TSB directed dealerships to inspect the OCV carefully before replacing if it was suspected as "a cause of … misfire-related trouble codes," including P0300.  In particular, the dealerships were instructed not to replace the OCV, but inspect for other engine malfunctions.  The procedure on the TSB also instructed dealerships to inspect the OCV for foreign debris, including flashing or aluminum chips, inside the OCV.  Only if the OCV was out of specification, or if the debris could not be removed, would a replacement OCV be authorized.

148.   Hyundai issued a nearly identical TSB at the same time, covering all of its models with CVVT, including the Hyundai Accent with Gamma 1.6L engines (model years not indicated). Again, the dealerships were instructed not to replace the OCV, but inspect for other engine malfunctions.  The procedure on the TSB also instructed dealerships to inspect the OCV for foreign debris, including flashing or aluminum chips, inside the OCV.  Only if the OCV was out of specification, or if the debris could not be removed, would a replacement

1    OCV be authorized.

2        149.   In February 2011, Hyundai issued a TSB (11-01-006) for the 2011

3    Hyundai Accent, instructing its dealerships to perform an ECM update on the

4    vehicles.  Similarly, in October 2011, Hyundai issued a TSB (11-01-015) for the

5    2010 Hyundai Accent, instructing its dealerships to perform an ECM update on

6    the vehicles.[11]

7        150.   The point of Defendants' approach to these problems is obvious—

8    reduce the amount they have to spend on in-warranty problems in the hope that

9    the vehicle will eventually exit the warranty period and consumers will be

10   saddled with expensive repairs.

11       151.   In November 2012, Kia issued a TSB directing its dealers to inspect

12   the 2013 Kia Rio with the Gamma GDI engine for defective timing chains and

13   guides, which could damage the engine.  However, the TSB called for dealers to

14   replace the engine sub-assembly and long block, rather than just the timing

15   chains and guides.

16       152.   In February 2016, and again in February 2017, Hyundai issued a

17   TSB to initiate a "service campaign" for 2015 Hyundai Accents and Velosters

18   with a 1.6L GDI engine.  The TSBs instructed dealers to perform an ECM update

19   if the vehicle's MIL was illuminated and the DTC P0441 (incorrect canister

20   purge valve flow) was stored in the computer.

21       153.   In April 2018, Hyundai issued a TSB instituted a "service

22   campaign" for certain 2018 Hyundai Accents with Gamma 1.6L GDI engines for

23   a spark plug replacement to address DTC codes P0300 to P0304 and complaints

24   of the engine running roughly.   The TSB instructed dealers to inspect the spark

25   plugs, and clear the codes, but did not address the cause of the issue.

26

27   [11] Neither of these TSBs is on the NHTSA website, because manufacturers were
     not required to publish them with NHSTA prior to 2012.  As such, this is the
28   only information available regarding these two TSBs.

154.   In February 2019, Hyundai and Kia recalled nearly 379,000 2012 to 2016 Kia Souls with the Gamma GDI engine.  This recall directed dealers to inspect the catalytic converters in the vehicles and replace, if the component was found to be damaged. In some instances, Hyundai and Kia acknowledged the damage could be severe enough that the entire engine would have to be replaced. The catalytic converters were damaged by the high exhaust-gas temperatures, causing abnormal combustion and damaging the engine's pistons and connecting rods.  A failed connecting rod can perforate the engine block, causing oil leaks and subsequent fires.  However, upon information and belief, the vast majority of recalled vehicles only received a software update, and not a replacement of the catalytic converter or the engine.

155.   In March 2019, Hyundai recalled about 20,000 2013 Hyundai Veloster with the Gamma GDI engine, for a software problem which causes the fuel to prematurely ignite in the cylinders near the pistons, and not in the combustion chamber.  This added additional pressure, damaged the engine, and caused the vehicles to stall, seize, and catch fire.

156.   Both of these recalls are attempts by Defendants to mitigate their damages, both in costs and in brand reputation, by only recalling some of the Class Vehicles.  However, even those vehicles subject to these recalls retain the Defect, and the recall repairs are insufficient to permanently fix the Defect, as can be seen by the fire in Plaintiff Martin's 2016 Kia Soul, which occurred after the vehicle had receive the recall repairs related to the catalytic converter.

157.   In January 2020, Kia issued a new TSB for a "service campaign" related to the 2020 Kia Soul with Gamma GDI engines.  For vehicles whose check engine light came on and whose vehicles had the codes related to cylinder misfires (P0300-P0304), the dealers were to upgrade the ECU logic (i.e. reprogram).  Notably, the TSB included the admonition in bold type: "A Service

Action is a repair program without customer notification that is performed during the warranty period.  Any dealer requesting to perform this repair outside the repair period will require DPSM approval."   Upon information and belief, DPSM stands for District Parts and Service Manager, a position at KMA which oversees dealerships.

158.   In February 2020, Kia issued a new TSB for a "product improvement campaign" related to 2012-2016 Kia Soul with 1.6L Gamma GDI engines to perform a "software update to the Engine Control Unit (ECU) to install the Knock Sensor Detection System (KSDS) in order to protect the engine from excessive connecting rod bearing damage."  Notably, this is not a repair, but merely the installation of a new early warning system, as described by the TSB:

> The KSDS detects vibrations indicating the onset of excessive connecting rod bearing wear.  It is designed to alert the drive at an early stage of bearing wear before the occurrence of severe engine damage, including engine failure.  If vibrations caused by bearing wear start to occur, the Malfunction Indicator Lamp (MIL) will blink continuously, and the vehicle will be placed in Limp Home Mode. This will reduce further damage to the engine and ensure that the vehicle occupants are not exposed to the risk of a more severe engine failure. At that time, Diagnostic Trouble Code ("DTC") P1326, specific to the KSDS, will be recorded in the ECU.

159.   Similarly, in April 2020, Kia issued a new TSB for a "service action" related to 2019-2020 Kia Forte GT equipped with Gamma GDI engines. For vehicles whose check engine light came on and whose vehicles had the codes related to cylinder misfires (P0300-P0304), the dealers were to upgrade the ECU logic (i.e. reprogram).  Notably, the TSB included the admonition in bold type: "A Service Action is a repair program without customer notification that is performed during the warranty period.  Any dealer requesting to perform this repair outside the repair period will require DPSM approval."

160.   These TSBs and the repairs they describe do not disclose the Defect or the fact that it is the common cause of these problems, often are issued to dealerships with explicit instructions not to reveal the information to consumers, and require some technical knowledge of cars to fully comprehend.  To the extent a Class Member may have been able to find them, these TSBs offer only partial information and further, *give the impression that Hyundai and Kia are trying to remedy any issues without disclosing the full extent and severity of the Defect in affected vehicles.*

161.   Further, notwithstanding these TSBs, many Class Members report that Hyundai and Kia are reluctant to honor the warranties provided with the vehicles after they report excessive oil consumption, stalling, engine failure, and/or fires.  Instead, Hyundai and Kia blame Class Members for failing to maintain their vehicles, even when provided maintenance records which show that routine service has been provided according the published maintenance schedules.  Often, Hyundai and Kia cite the fact that a Class Member sought an oil change from another provider as the reason they will not honor the warranty, despite the fact that the warranty does not require that all maintenance be performed at authorized dealers.

162.   Even some members of the Class whose vehicles have been recalled have found Hyundai and Kia are refusing to replace damaged engines, as described by one complaint to NHTSA below.

| NHTSA ID Number: | 11279888 |
|---|---|
| Incident Date: | October 15, 2019 |
| Report Date: | November 13, 2019 |
| Location: | Clermont, FL |
| VIN: | KNDJT2A57D7**** |
| Vehicle: | 2013 Kia Soul |

I TOOK MY VEHICLE TO KIA FOR TWO RECALLS AND A

PERFORMANCE ISSUE WITH THE ENGINE; SPECIFICALLY A
LOSS OF POWER AND INCREASED OIL CONSUMPTION. KIA
PERFORMANCE AN ECU UPGRADE AND REPLACED THE
CATALYTIC CONVERTER RELATED TO RECALL# SC176. THE
RECALL ALSO IDENTIFIES INTERNAL ENGINE DAMAGE TO THE
PISTONS THAT RESULT FROM OVERHEATING CAUSED BY HIGH
CATALYTIC CONVERTER TEMPERATURES WHICH WAS
ADDRESSED BY THE ECU UPGRADE. I INQUIRED ABOUT
COVERAGE FOR THE DAMAGE TO THE ENGINE; HOWEVER I
WAS TOLD THAT THE ENGINE DAMAGE WOULD NOT BE
COVERED BY KIA. AN OIL CONSUMPTION TEST WAS
PERFORMED AND KIA DOCUMENTED THAT 1 QUART OF OIL
HAD BEEN CONSUMED IN THE 1,000 ELAPSED MILES (WHICH
EXCEEDS THE MANUFACTURER[]S SPECIFICATION FOR
NORMAL RATE OF CONSUMPTION), I WAS TOLD THAT THE
ENGINE WOULD NEED TO BE REPLACED, AND KIA WOULD NOT
COVER THE COST. I WAS VERY SURPRISED AS THE ISSUES
THAT I AM HAVING WITH THE CAR ARE EXACTLY THE VERY
SAME ISSUES DESCRIBED IN THE RECALL.

163.   In addition, upon information and belief, Hyundai and Kia have
received thousands of calls on their customer service lines regarding the Defect
in Class Vehicles, including hundreds of reports of fires from the first year the
Gamma GDI was introduced up to the filing of this complaint.

164.   Defendants had knowledge that their misrepresentations and
omissions regarding the safety and performance of the Class Vehicles were
misleading, yet they continued to make the same misrepresentations and
omissions regarding the quality of their vehicles, that they would honor their

warranties for manufacturing and/or workmanship defects, the existence of the Defect and its associated safety risk to Plaintiffs and members of the proposed Classes, despite the fact that Defendants knew that the Vehicles were defective and posed a highly dangerous threat to public safety.

165.   Defendants' marketing and advertising practices are clearly meant to mislead consumers as to the safety and reliability of the Class Vehicles, as well as Hyundai and Kia's willingness to honor their express warranties.  As a direct and proximate result of Defendant's conduct, Plaintiffs and the proposed Classes have suffered, and continue to suffer, injury in fact, ascertainable losses, including the loss of their vehicles, and lost money.  Defendants, despite having knowledge that their representations and omissions are misleading to Plaintiffs and the proposed Classes, continue to market and advertise the Class Vehicles in a deceptive manner.

166.   Plaintiffs and the proposed Classes are at risk of suffering further injury if the relief sought is not granted.

167.   The alleged Defect was inherent in each Class Vehicle and was present in each Class Vehicle at the time of sale.

168.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Hyundai or Kia vehicle that was equipped with a Gamma GDI engine.  Had Plaintiffs and other Class Members known that the Class Vehicles had the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them.

169.   Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's engine will function in a manner that will not pose a safety hazard and is free from defects that can cause the vehicle to stall while being driven or cause a fire.  Plaintiffs and Class Members further reasonably expect that Defendants

will not sell or lease vehicles with known safety defects, such as the Defect, will disclose any such defects to its consumers when they learn of them, and will attempt to remediate and repair such defects.  They did not expect Defendants to fail to disclose the Defect to them, to continually deny the extent of the defect, and to fail to honor their warranties as promised.

**California Contacts**

170.   Both HMA and KMA are corporations organized and in existence under the laws of the State of California and registered to do business in the State of California.

171.   Both HMA and KMA do substantial business in California, with a significant portion of the sales and leases made in California. In fact, the majority of their work in sales, marketing, distribution, import, export, and warranty of Hyundai and Kia branded products, including vehicles and parts, takes placed in California.

172.   California hosts a significant portion of Defendants' U.S. operations, including sales and service offices and financial service offices, among others.

173.   In addition, the conduct that forms the basis for each and every Class member's claims against Defendants emanated from the HMA and KMA headquarters in California, and is consistent with directives of Defendants' personnel in California.

174.   Defendant HMA and KMA's marketing and advertising personnel are located at their California headquarters, and the advertising and marketing schemes, as well as the Owner's Guides and Owner's Manuals describing the safety and performance of the Vehicles (which omitted to describe the Defect), were made and implemented from those California headquarters.

175.   Defendant HMA and KMA's California personnel implemented its

deceptive advertising scheme and other materials and have refused to repair the Defect in Plaintiffs' Vehicles.

176. Defendants' personnel responsible for communicating with dealers regarding known problems with the defective Vehicles are also located at the California headquarters, and the decision to not inform authorized dealers of the Defect was made and implemented from Defendant HMA and KMA's California headquarters.

177. Moreover, HMC and KMC's instructions as to HMA and KMA's actions related to manufacturing, technical specifications, and warranty repairs, as well as the information that forms the basis for the TSBs and other technical materials published by HMA and KMA, are directed to California personnel at HMA and KMA for distribution throughout the United States.

178. Upon information and belief, the Gamma 1.6L GDI engines and/or the vehicles which have these engines are also shipped by HMC and KMC to California ports so that HMA and KMA can take possession of them and distribute them to their network of authorized dealerships throughout the United States.

179. Defendants have significant contacts with the State of California, and the conduct at issue herein emanated from California.

180. As a result of Defendants' conduct, Plaintiffs and members of the proposed Classes have suffered injury in fact and have otherwise suffered damages, and have been harmed and will continue to be harmed in the future, unless Defendants are held accountable through this litigation.

181. Plaintiffs seek injunctive relief, actual damages, disgorgement of profits, statutory damages, attorneys' fees, costs, and all other relief available to the Classes, as defined herein.

## TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

182.   Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Classes were deceived regarding the Class Vehicles and could not reasonably discover the Defect or Defendants' deception with respect to the Defect.  Defendants and their agents continue to deny the existence and true extent of the Defect, even when questioned by Plaintiffs and members of the Classes.

183.   Plaintiffs and members of the Classes did not discover and did not know of any facts that would have caused a reasonable person to suspect that the Defendants were concealing a defect and/or the Class Vehicles contained the Defect and the associated safety risk. As alleged herein, the existence of the Defect was material to Plaintiffs and members of the Classes at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Classes could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

184.   At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Classes the true standard, quality and grade of the Class Vehicles and to disclose the Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Defect in Class Vehicles.

185.   Defendants knowingly, actively and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Classes reasonably relied on Defendants' knowing, active, and affirmative concealment.

186.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and

1    Defendants are estopped from relying on any statutes of limitations in defense of

2    this action.

3                              **CLASS ACTION ALLEGATIONS**

4          187.   Plaintiffs bring this lawsuit as a class action on behalf of themselves

5    and all others similarly situated as members of the proposed Class pursuant to

6    Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the

7    numerosity, commonality, typicality, adequacy, predominance, and superiority

8    requirements of those provisions.

9          188.   The Class and Sub-Classes are defined as:

10

11

12         <u>**Class**</u>:   All individuals in the United States who
      purchased or leased Hyundai or Kia brand vehicles with
13    a "Gamma" 1.6L engine.

14    •  <u>**California Sub-Class:**</u> All members of the Class who
         purchased or leased their vehicles in the State of
15       California.

16    •  <u>**CLRA Sub-Class:**</u>  All members of the Class who are
         "consumers" within the meaning of California Civil
17       Code § 1761(d).

18    •  <u>**Florida Sub-Class**</u>:  All members of the Class who
         purchased or leased their vehicles in the State of Florida.

19    •  <u>**Louisiana Sub-Class:**</u>  All members of the Class who
20       purchased or leased their vehicles in the State of
         Louisiana.

21    •  <u>**Missouri Sub-Class**</u>:   All members of the Class who
22       purchased or leased their vehicles in the State of
         Missouri.

23    •  <u>**Virginia Sub-Class**</u>:   All members of the Class who
24       purchased or leased their vehicles in the State of
         Virginia.

25         189.   Excluded from the Class and Sub-Classes are: (1) Defendants, any

26   entity or division in which Defendants has a controlling interest, and their legal

27   representatives, officers, directors, assigns, and successors; (2) the Judge to

28

---

whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

190.   Numerosity: Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, upon information and belief, the number is great enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various states.

191.   Typicality: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, has been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective component systems. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

192.   Commonality: There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)     Whether Class Vehicles suffer from the Defect;

1    (b)    Whether the defects constitute an unreasonable safety risk;

2    (c)    Whether Defendants have knowledge of the Defect and, if so,

3            how long Defendants has known of the defect;

4    (d)    Whether the Defect constitutes a material fact;

5    (e)    Whether Defendants have a duty to disclose the Defect to

6            Plaintiffs and Class Members;

7    (f)    Whether Plaintiff and the other Class Members are entitled to

8            equitable relief, including a preliminary and/or permanent

9            injunction;

10   (g)    Whether Defendants knew or reasonably should have known

11           of the Defect before they sold and leased Class Vehicles to

12           Class Members;

13   (h)    Whether Defendants should be declared financially

14           responsible for notifying the Class Members of problems with

15           the Class Vehicles and for the costs and expenses of repairing

16           the Defect;

17   (i)    Whether Defendants are obligated to inform Class Members

18           of their right to seek reimbursement for having paid to

19           diagnose or repair the Defect;

20   (j)    Whether Defendants breached their express warranties under

21           UCC section 2301;

22   (k)    Whether Defendants violated the California Legal Remedies

23           Act;

24   (l)    Whether Defendants violated the Song-Beverly Consumer

25           Warranty Act;

26   (m)    Whether Defendants violated California's Unfair Competition

27           Law;

28

1
2

    (n)    Whether Defendants violated the Florida Deceptive and Unfair Trade Practices Act;

3
4

    (o)    Whether Defendants violated the Louisiana Products Liability Act;

5

    (p)    Whether the Class Vehicles suffer from rehibitory defects;

6
7

    (q)    Whether Defendants violated the Missouri Merchandising Act;

8
9

    (r)    Whether Defendants violated the Virginia Consumer Protection Act;

10
11

    (s)    Whether Defendants were unjustly enriched by their actions; and

12
13

    (t)    Whether damages, restitution, equitable, injunctive, compulsory or other relief are warranted.

14      193.   Adequate Representation: Plaintiffs will fairly and adequately
15 protect the interests of the Class Members. Plaintiffs have retained attorneys
16 experienced in the prosecution of class actions, including consumer and product
17 defect class actions, and they intend to prosecute this action vigorously.

18      194.   Predominance and Superiority: Plaintiffs and Class Members have
19 all suffered and will continue to suffer harm and damages as a result of
20 Defendants' unlawful and wrongful conduct. A class action is superior to other
21 available methods for the fair and efficient adjudication of the controversy.
22 Absent a class action, most Class Members would likely find the cost of
23 litigating their claims prohibitively high and would therefore have no effective
24 remedy. Because of the relatively small size of the individual Class Members'
25 claims, it is likely that only a few Class Members could afford to seek legal
26 redress for Defendants' misconduct. Absent a class action, Class Members will
27 continue to incur damages, and Defendants' misconduct will continue without

28

FIRST AMENDED CLASS ACTION COMPLAINT

1  remedy or relief.  Class treatment of common questions of law and fact would
2  also be a superior method to multiple individual actions or piecemeal litigation in
3  that it will conserve the resources of the courts and the litigants and promote
4  consistency and efficiency of adjudication.

**FIRST CAUSE OF ACTION**
**Violation of California's Consumers Legal Remedies Act,**
**California Civil Code § 1750,** *et seq.*
**(on behalf of the Class against All Defendants)**

8  195.   Plaintiffs incorporate by reference the allegations contained in
9  paragraphs 1 to 186 of this Complaint.

10  196.   Plaintiffs bring this cause of action on behalf of themselves and on
11  behalf of the members of the CLRA Class, or in the alternative, Plaintiff Pelayo
12  brings this cause of action on behalf of the California Sub-Class.

13  197.   Defendants are "persons" as defined by California Civil Code §
14  1761(c).

15  198.   Plaintiffs and CLRA Class Members are "consumers" within the
16  meaning of California Civil Code § 1761(d) because they purchased their Class
17  Vehicles primarily for personal, family, or household use.

18  199.   By failing to disclose and concealing the defective nature of the
19  Gamma engines from Plaintiffs and Class Members, Defendants violated
20  California Civil Code § 1770(a). *See* CAL. CIV. CODE §§ 1770(a)(5) & (7).

21  200.   Defendants' unfair and deceptive acts or practices, including but not
22  limited to denying the Defect exists, occurred repeatedly in Defendants' trade or
23  business.  These deceptive acts or practices were capable of deceiving a
24  substantial portion of the purchasing public and did in fact deceive a substantial
25  portion of the public.

26  201.   Defendants' unfair and deceptive acts or practices imposed a serious
27  safety risk on the public, because the Defect makes millions of vehicles prone to

1  sudden breakdowns, stalling, and spontaneous fires on public roads.

2  202.  Defendants knew that the Class Vehicles and the Gamma Engines

3  suffered from inherent defects, were defectively manufactured and/or had

4  workmanship defects, and were not suitable for intended use.

5  203.  As a result of their reliance on Defendants' omissions regarding the

6  existence, extent and scope of the Defect, owners and/or lessees of the Class

7  Vehicles suffered an ascertainable loss of money, property, and/or value of their

8  Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and Class

9  Members were harmed and suffered actual damages in that their Class Vehicles

10  were totally destroyed, functionally destroyed when their engines failed before

11  the expected useful life of the vehicle, required extremely expensive repairs

12  and/or paid high maintenance costs due to the vehicles' excessive oil

13  consumption.

14  204.  Defendants were under a duty to disclose the Defect and its

15  associated safety risk and repair costs to Plaintiffs and members of the Class

16  because:

17      a.  Defendants were in a superior position to know the true state of

18         the facts about the Defect and its associated safety risks and

19         repair costs in the Class Vehicles' Gamma engines;

20      b.  Plaintiffs and Class Members could not reasonably have been

21         expected to learn or discover that their engines had a dangerous

22         safety defect until it manifested; and

23      c.  Defendants knew that Plaintiffs and Class Members could not

24         reasonably have been expected to learn of or discover the Defect

25         and its associated safety risks.

26  205.  In failing to disclose the defective nature of the Gamma engines,

27  Defendants knowingly and intentionally concealed material facts and breached

28

1   their duties not to do so.

2   206.   The facts about the Defect that the Defendants concealed from, or

3   failed to disclose to, Plaintiffs and Class Members are material in that in that a

4   reasonable consumer would have considered them important in deciding whether

5   to purchased or lease the Class Vehicles or to pay less.  Had they known that the

6   Class Vehicles' engines were defective, Plaintiffs and Class Members would not

7   have purchased or leased the Class Vehicles or would have paid less for them.

8   207.   Plaintiffs and Class Members are reasonable consumers who do not

9   expect the engines installed in their vehicles to exhibit problems such as:

10   excessive oil consumption, stalling, premature failure, or to spontaneously burst

11   in flames and produce fast-moving fires which destroy the vehicle and endanger

12   the lives of the vehicle's occupants.  These are reasonable and objective

13   consumer expectations relating to vehicle engines.

14   208.   As a result of Defendants' conduct, Plaintiff and Class Members

15   were harmed and suffered actual damages in that, on information and belief, the

16   Class Vehicles experienced and may continue to experience problems such as:

17   excessive oil consumption, stalling, premature failure, or to spontaneously burst

18   in flames and produce fast-moving fires which destroy the vehicle and endanger

19   the lives of the vehicle's occupants.

20   209.   As a direct and proximate result of Defendants' unfair or deceptive

21   acts or practices, Plaintiffs and Class Members suffered and will continue to

22   suffer actual damages.

23   210.   Plaintiffs and the Class are entitled to equitable relief.

24   211.   Plaintiffs provided Defendants with notice of its violations of the

25   CLRA pursuant to California Civil Code § 1782(a) on August 7, 2020. If within

26   30 days, Defendants fail to provide appropriate for their violations of the CLRA,

27   Plaintiffs will seek monetary, compensatory, and punitive damages, in addition

28

1  to the injunctive and equitable relief they currently seek.

2  **SECOND CAUSE OF ACTION**
**Breach of Express Warranty**
3  **(On behalf of the Class, or in the alternative, on behalf the Sub-Classes against Defendants HMA and KMA)**
4

5  212.   Plaintiffs incorporate by reference the allegations contained in

6  paragraphs 1 to 186 of this Complaint.

7  213.   Plaintiffs Sara Pelayo, Miles and Olivia McGregor, Seth and

8  Christina Martin, and Dorothy Rice bring this claim on behalf of themselves and

9  the Class, or in the alternative, Plaintiff Pelayo brings this claim on behalf of the

10  California Sub-Class, Plaintiffs Miles and Olivia McGregor bring this claim on

11  behalf of the Florida Sub-Class, Plaintiffs Seth and Christina Martin bring this

12  claim on behalf of the Missouri Sub-Class, and Plaintiff Rice brings this claim

13  on behalf of the Virginia Sub-Class.

14  214.   As a result of Defendants HMA and KMA's breach of the

15  applicable express warranties, owners and/or lessees of the Class Vehicles

16  suffered an ascertainable loss of money, property, and/or value of their Class

17  Vehicles. Additionally, as a result of the Defect, Plaintiffs and members of the

18  Class were harmed and suffered actual damages in that their vehicles and their

19  possessions inside of those vehicles were completely lost to engine fires.

20  215.   Defendants HMA and KMA provided all purchasers and lessees of

21  Hyundai and Kia-branded Class Vehicles with the express warranty described

22  herein, which became a material part of the bargain.

23  216.   Defendants HMC and KMC manufactured and/or installed the

24  engine and its component parts in the Class Vehicles, and the engine and its

25  component parts are covered by the express  warranty provided by Defendants

26  HMA and KMA.

27  217.   HMA and KMA provided all purchasers and lessees of the Class

28

Vehicles with a New Vehicle Basic Limited Warranty, lasting 5 years or 60,000, whichever comes first, and a Powertrain Limited Warranty, lasting 10 years or 100,000 miles, whichever comes first.

218.   HMA and KMA breached the express warranty by performing illusory repairs or insufficient repairs via their TSBs and recalls. Rather than repairing the vehicles pursuant to the express warranty, HMA and KMA falsely informed Class Members that there was no problem with their vehicles and/or the stalls and/or fires were caused by other issues, such as leaves or improper maintenance even when provided with evidence to the contrary.  HMA and KMA's breaches ensured that the Defect would continue to manifest, even outside of the Class Vehicles' express warranty period, at which point HMA and KMA would deny any responsibility for repairing the Defect.

219.   Any attempted by Defendants HMA and KMA to disclaim or limited recovery to the terms of the express warranties is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because Defendants HMA and KMA knowing sold or leased a defective product without informing consumers about the Defect.  The time limits, as well as the limitation that only vehicles serviced by authorized dealers may be deemed "properly maintained", *a term which does not appear in the express warranty but has been a basis to refuse a warranty repair as alleged,* are unconscionable and inadequate to protect Plaintiffs and members of the Class.  Among other things, Plaintiffs and members of the Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which unreasonably favored Defendants HMA and KMA.  A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect, existed between Defendants HMA and KMA and members of the Class, including Plaintiffs.

220.   Further, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Class whole, because, on information and belief, Defendants HMA and KMA have failed and/or have refused to adequately provide the promised remedies, i.e. a repair, within a reasonable time.

221.   Plaintiffs and the members of the Class were not required to notify HMA and KMA of their breach of express warranty and/or were excused from doing so because affording HMA and KMA a reasonable opportunity to cure their breach of written warranty would have been futile. Defendants were also on notice of the Defect from their own pre-production testing, quality control audits, the complaints and service requests they received from Class Members, from repairs and/or replacements of the engine or a component thereof, and through other internal sources.

222.   Further, Defendants HMA and KMA were notified of the Defect and have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and members of the Class called the customer service line to report fires in their vehicles.  Defendant also received notice from Plaintiffs Miles and Olivia McGregor and Christina Martin on or around July 20, 2020 via letter and from Plaintiff Pelayo via letter on or about August 7, 2020.  Defendant also received notice from Plaintiff Rice and her family members when they contacted the Kia Consumer Assistance Center on or about December 24, 2020 following their visit to Kia of Lynchburg to report the fire that had consumed Plaintiff Rice's vehicle on the day prior.

223.   Plaintiffs and the members of the Class experienced the existence of the Defect within the warranty periods but had no knowledge of the existence of the Defect, which was known and concealed by Defendants HMA and KMA.

FIRST AMENDED CLASS ACTION COMPLAINT

1   Despite the existence of the warranties, Defendants HMA and KMA failed to
2   inform Plaintiffs and members of the Class that the Class Vehicles contained the
3   Defect during the warranty periods, and failed to repair the Defect during the
4   warranty periods, and thus, wrongfully transferred the costs of repair,
5   replacement of the engine, and/or total vehicle loss to Plaintiffs and members of
6   the Class.

7       224.   Because of the Defect, the Class Vehicles are not reliable and
8   owners of these vehicles have lost confidence in the ability of Class Vehicles to
9   perform the function of safe, reliable transportation.

10      225.   As a direct and proximate cause of Defendants' breach, Plaintiffs
11  and members of the Class suffered, and continue to suffer, damages, including
12  economic damages at the point of sale or lease.  Additionally, Plaintiffs and
13  members of the Class either have incurred or will incur economic damages at the
14  point of total loss of their vehicles.

15      226.   Plaintiffs and members of the Class are entitled to legal and
16  equitable relief against Defendants HMA and KMA, including actual damages,
17  consequential damages, specific performance, attorneys' fees, costs of suit, and
18  other relief as appropriate.

19
20                     **THIRD CAUSE OF ACTION**
                **Breach of Implied Warranty of Merchantability**
21  **(On behalf of the Class, or in the alternative, on behalf the Sub-Classes
                          against All Defendants)**

22      227.   Plaintiffs incorporate by reference the allegations contained in
23  paragraphs 1 to 186 of this Complaint.

24      228.   Plaintiffs Sara Pelayo, Miles and Olivia McGregor, Christina
25  Martin, and Dorothy Rice bring this claim on behalf of themselves and the Class,
26  or in the alternative, Plaintiff Miles and Olivia McGregor bring this claim on
27  behalf of the Florida Sub-Class, Plaintiff Martin brings this claim on behalf of
28

the Missouri Sub-Class, and Plaintiff Rice brings this claim on behalf of the Virginia Sub-Class.

229.    Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale and thereafter.

230.    Plaintiffs and the Class were not required to notify Defendants of their breach of implied warranty and/or were excused from doing so because affording Defendants a reasonable opportunity to cure their breach of implied warranty would have been futile. Defendants were also on notice of the Defect from their own pre-production testing, quality control audits, complaints and service requests it received from Class Members, from repairs and/or replacements of the engine or a component thereof, and through other internal sources.

231.    Defendants has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs presented their vehicles for recalls and service at authorized dealerships, and when Plaintiffs contacted customer service lines to report engine stalls or fires in their vehicles.

232.    In addition, on or about July 20, 2020, Plaintiffs Miles and Olivia McGregor and Plaintiff Martin gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers. On or about August 7, 2020, Plaintiff Pelayo also gave such notice. Defendant also received notice from Plaintiff Rice and her family members when they contacted the Kia Consumer Assistance Center on or about December 24, 2020

following their visit to Kia of Lynchburg to report the fire that had consumed Plaintiff Rice's vehicle on the day prior.

233.   Because Plaintiffs purchased their vehicles from authorized dealers, they in privity with Defendants since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.  Furthermore, under Missouri and Virginia law, no privity is required between the parties to assert a breach for implied warranty of merchantability.  As alleged, the authorized dealerships for Hyundai and Kia are agents of HMA and KMA, who themselves are agents of HMC and KMC, respectively.

234.   As a result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles.

235.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use.

### FOURTH CAUSE OF ACTION
#### Fraud by Omission and/or Fraudulent Concealment
**(On behalf of the Class, or in the alternative, on behalf the Sub-Classes against All Defendants)**

236.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 186 of this Complaint.

237.   Plaintiffs Sara Pelayo, Miles and Olivia McGregor, Christina and Seth Martin, and Dorothy Rice bring this claim on behalf of themselves and the Class, or in the alternative, Plaintiff Pelayo brings this claim on behalf of the California Sub-Class, Plaintiffs Miles and Olivia McGregor bring this claim on behalf of the Florida Sub-Class, Plaintiffs Christina and Seth Martin bring this claim on behalf of the Missouri Sub-Class, and Plaintiff Rice brings this claim

1    on behalf of the Virginia Sub-Class.

2        238.   Defendants intentionally and knowingly concealed, suppressed

3    and/or omitted material facts concerning the standard, quality or grade of the

4    Class Vehicles, the presence of the Defect installed in the Class Vehicles, and the

5    risk to the safety, functionality, and reliability of the Class Vehicles due to the

6    Defect.

7        239.   Defendants' intentional and knowing concealment, suppression

8    and/or omission of these material facts was done with the intent that Plaintiffs

9    members of the Class would rely on Defendants' omissions.

10       240.   As a direct result of Defendants' fraudulent conduct, Class Members

11   have suffered actual damages.

12       241.   Defendants knew (at the time of sale or lease and thereafter) that the

13   Class Vehicles contained the Defect, but Defendants concealed the Defect and

14   never intended to repair or replace the Defect during the warranty periods.  What

15   recalls and repairs that have been provided have failed to fully and permanently

16   repair the Defect, in part because Defendants refuse to acknowledge the extent of

17   the Defect.  To date, Defendants have not provided Plaintiffs and members of the

18   Class with a repair or remedy that will eliminate the Defect.

19       242.   Defendants owed a duty to disclose the Defect and its corresponding

20   safety hazard to Plaintiffs and members of the Class because Defendants

21   possessed superior and exclusive knowledge regarding the Defect.  Rather than

22   disclose the Defect, Defendants intentionally and knowingly concealed,

23   suppressed and/or omitted material facts concerning the Defect so that Defendant

24   could sell additional Class Vehicles and avoid the cost of repair or replacement.

25       243.   Additionally, once Defendants made representations to the public

26   about safety, quality, functionality, and reliability, Defendants were under a duty

27   to disclose these omitted facts, because where one does speak one must speak the

28

whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

244.   The Defect exposes drivers and occupants to an unreliable vehicle with a dangerous safety defect. Plaintiffs and members of the Class had a reasonable expectation that the vehicles would not expose them and other vehicle occupants to such a safety hazard.  No reasonable consumer expects a vehicle to be manufactured and assembled with an engine that, like the engine in the Class Vehicles, causes the vehicle to stall or have an engine fire.

245.   Plaintiffs and members of the Class would not have purchased or leased the Class Vehicles but for Defendants' omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Defect, or would have paid less for the Class Vehicles.

246.   Defendants knew their concealment and suppression of material facts were false and misleading and knew the effect of concealing those material facts.  Defendants knew their concealment and suppression of the Defect would enable it to sell more Class Vehicles and would discourage Plaintiffs and members of the Class from seeking replacement or repair of the Defect.  Further, Defendants intended to induce Plaintiffs and members of the Class into purchasing or leasing the Class Vehicles and to discourage them from seeking replacement or repair of the Defect, in order to decrease costs and increase profits.

247.   Defendants acted with malice, oppression and fraud.

248.   Plaintiffs and members of the Class reasonably relied upon Defendants' knowing concealment and omissions.  As a direct and proximate result of Defendants' omissions and active concealment of material facts regarding the Defect and associated safety hazard, Plaintiffs and members of the

Class have suffered actual damages in an amount to be determined at trial.

**FIFTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On behalf of the Class, or in the alternative, on behalf the Sub-Classes**
**against All Defendants)**

249. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 186 of this Complaint.

250. Plaintiffs Sara Pelayo, Miles and Olivia McGregor, Christina and Seth Martin, and Dorothy Rice bring this claim on behalf of themselves and the Class, or in the alternative, Plaintiff Pelayo brings this claim on behalf of the California Sub-Class, Plaintiffs Miles and Olivia McGregor bring this claim on behalf of the Florida Sub-Class, Plaintiffs Christina and Seth Martin bring this claim on behalf of the Missouri Sub-Class, and Plaintiff Rice brings this claim on behalf of the Virginia Sub-Class.

251. Plaintiffs and Class Members conferred a benefit on Defendants by leasing or purchasing the Class Vehicles. Defendants were and should have been reasonably expected to provide Class Vehicles free from the Defect and associated safety risks.

252. Defendants unjustly profited from the lease and sale of the Class Vehicles at inflated prices as a result of its omissions and concealment of the Defect in the Class Vehicles. As detailed above, in 2019, Hyundai had $23.2 billion in worldwide sales revenue and Kia had $13.4 billion in worldwide sales revenue.

253. As a proximate result of Defendants' omissions and concealment of the Defect in the Class Vehicles, and as a result of Defendants' ill-gotten gains, benefits and profits, Defendants have been unjustly enriched at the expense of Plaintiffs and Class Members. It would be inequitable for Defendants to retain their ill-gotten profits without paying the value thereof to Plaintiffs and Class

1   Members.

2   254.   Plaintiffs and Class Members are entitled to restitution of the

3   amount of Defendants' ill-gotten gains, benefits and profits, including interest,

4   resulting from its unlawful, unjust and inequitable conduct.

5   255.   Plaintiffs and Class Members seek an order requiring Defendants to

6   disgorge their gains and profits to Plaintiffs and Class Members, together with

7   interest, in a manner to be determined by the Court

8   ## SIXTH CAUSE OF ACTION
    **Breach of Warranty Pursuant to Song-Beverly Consumer Warranty Act,**
9   **California Civil Code § 1791, *et seq.***
    **(On behalf of the California Sub-Class against All Defendants)**
10

11   256.   Plaintiffs incorporate by reference the allegations contained in

12   paragraphs 1 to 186 of this Complaint.

13   257.   Plaintiff Sara Pelayo brings this count on behalf of herself and the

14   California Sub-Class.

15   258.   Plaintiff Pelayo and the California Sub-Class members who

16   purchased or leased the Class Vehicles in California are "buyers" within the

17   meaning of Cal. Civ. Code § 1791(b).

18   259.   The Class Vehicles are "consumer goods" within the meaning of

19   Cal. Civ. Code § 1791(a).

20   260.   Defendants are "manufacturers" of the Class Vehicles within the

21   meaning of Cal. Civ. Code § 1791(j).

22   261.   Defendants impliedly warranted to Plaintiffs and the California Sub-

23   Class members that the Class Vehicles were "merchantable" within the meaning

24   of Cal. Civ. Code §§ 1791.1(a) and 1792.  Despite this, the Class Vehicles do not

25   have the minimum quality that a buyer would reasonably expect.

26   262.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of

27   merchantability" or "implied warranty that goods are merchantable" means that

28

the consumer goods meet each of the following:

          a.  Pass without objection in the trade under the contract description.

          b.  Are fit for the ordinary purposes for which such goods are used.

          c.  Are adequately contained, packaged, and labeled.

          d.  Conform to the promises or affirmations of fact made on the container or label.

263.  Plaintiff Pelayo and members of the California Sub-Class purchased or leased the Class Vehicles, manufactured by HMC and KMC, from HMA and KMA by and through their authorized agents for retail sales, and were otherwise expected to be the eventual purchasers of the Class Vehicles when bought from a third party.  At all relevant times, Defendants were the manufacturer, distributor, warrantor and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased.

264.  Defendants HMA and KMA provided Plaintiff Pelayo and members of the California Sub-Class with one or more express warranties.  For illustrative purposes, HMA and KMA provide all purchasers and lessees of the Class Vehicles with a New Vehicle Basic Limited Warranty, lasting 5 years or 60,000, whichever comes first, and a Powertrain Limited Warranty, lasting 10 years or 100,000 miles, whichever comes first.  Under warranties provided to members of the California Sub-Class, HMA and KMA promised to repair or replace covered defective components arising out of defects in materials and/or workmanship, including the Defect, at no costs to owners and lessees of the Class Vehicles. As alleged herein, HMA and KMA breached these warranties.

265.  Plaintiff Pelayo and members of the California Sub-Class experienced the Defect within the warranty periods but Defendants failed to inform Plaintiff Pelayo and members of the California Sub-Class of the existence of the Defect and associated safety hazard, and failed to provide a suitable repair

or replacement of the defective engine and/or any damaged powertrain components free of charge within a reasonable time.

266.  Defendants impliedly warranted that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used.

267.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and fit for the ordinary purpose for which vehicles are used.

268.  The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and were and not fit for the ordinary purposes of providing safe and reliable transportation. The Class Vehicles contain an inherent defect – the Defect related to the Gamma engines – (at the time of sale or lease and thereafter) and present an undisclosed safety risk to drivers and occupants. Thus, Defendants breached the implied warranty of merchantability.  Defendants cannot disclaim its implied warranty as it knowingly sold or leased a defective product.

269.  Defendants were provided notice of the Defect by internal testing, quality control audits, numerous consumer complaints made to authorized dealers nationwide, dealer audit reports, complaints to NHTSA, and through other internal sources.  Affording Defendants a reasonable opportunity to cure their breach of warranties would be unnecessary and futile here because Defendants have known of and concealed the Defect and, on information and belief, have refused to repair and replace Gamma engines and/or destroyed vehicles free of charge within a reasonable time.

270.  Defendants breached their express and/or implied warranties in violation of Cal. Civ. Code § 1791 *et seq*.

271.  As a direct and proximate result of Defendants' breach of their

FIRST AMENDED CLASS ACTION COMPLAINT

express and/or implied warranties, Plaintiff Pelayo and members of the California Sub-Class have been damaged in an amount to be proven at trial.

272. Plaintiff Pelayo and members of the California Sub-Class have been excused from performance of any warranty obligations as a result of Defendants' conduct described herein.

273. Plaintiff Pelayo and members of the California Sub-Class seek actual damages, costs, attorneys' fees, and statutory damages as a result of Defendants' willful conduct alleged herein.  Plaintiff Pelayo and members of the California Sub-Class also seek reimbursement, replacement of the defective Gamma engines and/or powertrain components damaged by the Defect, and/or revocation of the purchase or lease of the Class Vehicles, and all other relief available under Cal. Civ. Code § 1794.

274. The applicable statute of limitations for the implied warranty claim has been tolled by the discovery rule and/or fraudulent concealment.

### SEVENTH CAUSE OF ACTION
#### Violation of Unfair Competition Law,
#### Cal. Bus. & Prof. Code § 17200 *et seq.*
#### (On behalf of the California Sub-Class against All Defendants)

275. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 186 of this Complaint.

276. Plaintiff Sara Pelayo brings this count on behalf of herself and the California Sub-Class.

277. The California Business & Professions Code § 17200 *et seq.* (the "UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."

278. As alleged herein, Defendants have violated the UCL by engaging in unlawful, unfair and fraudulent business acts or practices.

279. In violation of the UCL, Defendants employed unfair, unlawful and deceptive acts or practices, fraud, false pretense, misrepresentations, or concealment, suppression or omission, in connection with the sale and/or lease of

Class Vehicles. Defendants knowingly concealed, suppressed and/or omitted material facts regarding the Defect and corresponding safety hazard and misrepresented the standard, quality or grade of the Class Vehicles, which directly caused harm to Plaintiff Pelayo and members of the California Sub-Class.

280.   Defendants actively suppressed the fact of the Defect's existence in Class Vehicles and that it present a dangerous safety hazard because of materials, workmanship, and/or manufacturing defects.  Further, Defendants employed unfair, unlawful and fraudulent business practices to deny repair or replacement of the defective Gamma engine in Class Vehicles within a reasonable time in violation of the UCL.

281.   Defendants breached the CLRA and the Song-Beverly Consumer Warranty Act as alleged herein in violation of the UCL.

282.   Defendants' unfair, unlawful and fraudulent business practices were likely to and did deceive reasonable consumers. Plaintiff Pelayo and members of the California Sub-Class have no reasonable way to know that Class Vehicles contained the Defect and the Class Vehicles were defective in materials, workmanship, and/or manufacture and posed a corresponding safety risk. Defendants possessed superior knowing as the quality and characteristics of the Class Vehicles and the Gamma engines, including the Defect and its associated safety risk, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions as did Plaintiff Pelayo and members of the California Sub-Class.

283.   Defendants intentionally and knowingly misrepresented and omitted facts regarding the Defect in the Class Vehicles and its associated safety hazard with the intent to mislead Plaintiff Pelayo and members of the California Sub-Class.  Defendants knew or should have known that the Class Vehicles possessed

the Defect and expose consumers to a corresponding safety hazard.

284.   Defendants owed a duty to disclose the Defect and its corresponding safety hazard to Plaintiff Pelayo and the members of the California Sub-Class because Defendants possessed superior knowledge.  Defendants also owed a duty to disclose the Defect because Defendants made partial representations regarding the safety of the Class Vehicles and thus owed a duty to reveal the complete truth to Plaintiff Pelayo and members of the California Sub-Class. Defendants had a duty to disclose any information relating to the safety, quality, functionality and reliability of the Class Vehicle because they consistently marketed the Class Vehicles as safe, functional, reliable, and as back by the longer warranty in the business.

285.   Once Defendants made representations to the public about safety, quality, functionality, and reliability, Defendants were under a duty to disclose the omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those stated facts.  One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.  Rather than disclose the Defect, Defendants engaged in unfair, unlawful and fraudulent business practices in order to sell additional Class Vehicles and avoid the costs of repair or replacement of the defective Gamma engines and/or damage powertrain components.

286.   Defendants' unfair, unlawful and fraudulent acts or practices, affirmative misrepresentations and/or material omissions regarding the Defect were intended to mislead consumers and misled Plaintiff Pelayo and members of the California Sub-Class.

287.   At all relevant times, Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or omissions regarding the Defect and its corresponding safety hazard were material to Plaintiff Pelayo and

members of the California Sub-Class.  When Plaintiff Pelayo and members of the California Sub-Class purchased or leased their Class Vehicles, they reasonably relied upon the reasonable expectation that the Class Vehicles would be free from defects that pose an unavoidable, highly dangerous safety hazard. Had Defendants disclosed that the Class Vehicles contained the Defect and/or pose an unavoidable, highly dangerous safety hazard, Plaintiff Pelayo and members of the California Sub-Class would not have purchased or leased the Class Vehicles, or would have paid less for their vehicles.

288.   Defendants had a continuous duty to Plaintiff Pelayo and members of the California Sub-Class to refrain from unfair, unlawful and fraudulent practices under the UCL and to disclose the Defect and associated safety hazard. Defendants' unfair, unlawful and fraudulent acts or practices, affirmative misrepresentations and/or material omissions regarding the Defect and corresponding safety hazard are substantially injurious to consumers.  As a result of Defendants' knowing, intentional concealment and/or omissions of the Defect and associated safety hazard in violation of the UCL, Plaintiff Pelayo and members of the California Sub-Class have suffered damages to be determined at trial. Owners and lessees of Class Vehicles also suffered a ascertainable loss in the form of, *inter alia*, out-of-pocket costs for diagnosis and repair or replacement of the defective Gamma engines and/or Class Vehicles, loss of the benefit of the bargain and diminished value of their vehicles as a result of Defendants' unfair, unlawful and fraudulent acts and practices in the course of their business.

289.   Defendants have knowingly and willfully engaged in the unfair, unlawful and fraudulent business practices alleged herein. Further, Defendants unconscionably marketed the Class Vehicles to uninformed consumer in order to maximize profits by selling additional Class Vehicles containing the undisclosed

1   Defect and corresponding safety hazard.

2       290.   Defendants' unfair, unlawful and fraudulent acts and practices have

3   harmed and continue to harm Plaintiff Pelayo and members of the California

4   Sub-Class, have negatively affected the public interest, including the resources

5   of numerous police and fire departments, and present a continuing safety hazard

6   to Plaintiff Pelayo and members of the California Sub-Class and the general

7   public.

8       291.   Plaintiff Pelayo and members of the California Sub-Class seek an

9   order enjoining Defendants' unfair, unlawful, and fraudulent practices and award

10   costs, attorneys' fees and restitution, disgorgement of funds, and any other just

11   and proper relief available under the UCL and California law.

12

13   **EIGHTH CAUSE OF ACTION**
   **Violation of the Florida Deceptive and Unfair Trade Practices Act,**
   **Fla. Stat. §§ 501.201, *et seq*.**

14   **(on behalf of the Florida Sub-Class against All Defendants)**

15       292.   Plaintiffs incorporate by reference the allegations contained in

16   paragraphs 1 to 186 of this Complaint.

17       293.   Plaintiffs Miles and Olivia McGregor bring this claim on behalf of

18   themselves and the Florida Sub-Class.

19       294.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

20   prohibits "[u]nfair methods of competition, unconscionable acts or practices, and

21   unfair or deceptive acts or practices in the conduct of any trade or commerce."

22   Fla. Stat. § 501.204(1). Defendants engaged in unfair and deceptive practices

23   that violated the FDUTPA as described above.

24       295.   Defendants engaged in "trade or commerce" in Florida within the

25   meaning of the FDUTPA. *See* Fla. Stat. § 501.203(8).

26       296.   In the course of their businesses, Defendants failed to disclose and

27   actively concealed the Defect contained in the Class Vehicles and the

28

1  corresponding dangers and risks posed by the Class Vehicles, as described above
2  and otherwise engaged in activities with a tendency or capacity to deceive.

3      297.  In violation of the FDUTPA, Defendants employed unfair and
4  deceptive acts or practices, fraud, false pretense, misrepresentation, or
5  concealment, suppression or omission of a material fact with intent that others
6  rely upon such concealment, suppression or omission, in connection with the sale
7  and/or lease of Class Vehicles. Defendants knowingly concealed, suppressed,
8  and omitted material facts regarding the Defect and associated safety hazard and
9  misrepresented the standard, quality, or grade of the Class Vehicles, which
10  directly caused harm to Plaintiff Miles and Olivia McGregor and the Florida
11  Sub-Class.

12      298.  Defendants actively suppressed the fact that the Class Vehicles
13  contain a Defect and presents a safety hazard because of materials,
14  workmanship, design, and/or manufacturing defects. Further, Defendants
15  employed unfair and deceptive trade practices by failing to provide repairs of the
16  Defect or replacement of destroyed Class Vehicles due to the Defect within a
17  reasonable time in violation of the FDUTPA. Defendants also breached its
18  warranties as alleged above in violation of the FDUTPA.

19      299.  As alleged above, Defendants have known of the Defect contained
20  in the Class Vehicles for well over a decade. Prior to selling and leasing the
21  Class Vehicles, Defendants knew or should have known the Class Vehicles
22  contained the Defect due to pre-production testing, quality control audits, and
23  failure mode analysis. Defendants also should have known of the Defect from
24  the early complaints and service requests it received from Class Members and
25  dealers, from its own investigation and issuance of service bulletins and recalls,
26  from repairs and/or replacements of engine components, and from other internal
27  sources. Defendants, nevertheless, failed to disclose and actively concealed the
28

dangers and risks posed by the Class Vehicles and the Defect.

300.   By failing to disclose and by actively concealing the Defect in the Class Vehicles, by marketing them as safe, reliable, and of high quality, and by presenting themselves as a reputable manufacturer or distributor for a reputable manufacture that values safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defect to cause stalling and engine fires. Further, Defendants knew, or should have known, that such incidents could cause the Class Vehicles to severely injure vehicle operators, passengers and other motorists and for the vehicles to become involved in collisions or other accidents.  Defendants deliberately concealed and failed to disclose this material information to ensure that consumers would purchase the Class Vehicles.

301.   In the course of Defendants' businesses, they willfully failed to disclose and actively concealed the dangerous risks posed by the Defect. Defendants compounded the deception by repeatedly asserting that the Class Vehicles were safe, reliable, and of high quality despite containing the Defect, and by claiming to be a reputable manufacturer or a reputable distributor for a reputable manufacturer that values safety.

302.   Defendants' unfair and deceptive trade practices were likely intended to deceive a reasonable consumer. Miles and Olivia McGregor and members of the Florida Sub-Class had no reasonable way to know that the Class Vehicles contained the Defect, which were defective in workmanship and/or manufacture and posed a serious and significant safety risk. Defendants possessed superior knowledge as to the quality and characteristics of the Class Vehicles, including the Defect within their vehicles and its associated safety risks, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions, as Plaintiffs Miles and Olivia McGregor and

1    members of the Florida Sub-Class did.

2        303.   Defendants intentionally and knowingly misrepresented material

3    facts and omitted material facts regarding the Class Vehicles and the Defect

4    present in Class Vehicles with an intent to mislead Miles and Olivia McGregor

5    and the Florida Sub-Class.

6        304.   Defendants knew or should have known that its conduct violated the

7    FDUTPA.

8        305.   Defendants made material statements and/or omissions about the

9    safety and reliability of the Class Vehicles and/or the defective engines installed

10   in them that were either false or misleading. Defendants' misrepresentations,

11   omissions, statements, and commentary have included selling and marketing

12   Class Vehicles as safe and reliable, despite their knowledge of the Defect and its

13   corresponding safety hazard.

14       306.   To protect their profits, avoid remediation costs and public relation

15   problems, and increase their profits by having consumers pay for component

16   parts and expensive repairs to remedy the Defect, Defendants concealed the

17   defective nature and safety risk posed by the Class Vehicles and existing Defect

18   at the time of sale or lease. Defendants allowed unsuspecting new and used car

19   purchasers and lessees to continue to buy or lease the Class Vehicles and

20   continue to drive them, despite the safety risk they pose.

21       307.   Defendants owed Miles and Olivia McGregor and the Florida Sub-

22   Class a duty to disclose the true safety and reliability of the Class Vehicles and

23   the existence of the Defect because Defendants:

24              a.   Possessed exclusive knowledge of the Defect and its associated

25                   safety hazard;

26              b.   Intentionally concealed the foregoing from Miles and Olivia

27                   McGregor and the Florida Sub-Class; and/or

28

c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Miles and Olivia McGregor and the Florida Sub-Class that contradicted these representations, inter alia, that a Defect existing at the time of sale or lease causes the Vehicles to stall or have an engine fire.

308.   Because Defendants fraudulently concealed the Defect in the Class Vehicles, and now that the Defect has been disclosed, the value of the Class Vehicles has greatly diminished, and they are now worth significantly less than they otherwise would be. Further, Miles and Olivia McGregor and the Florida Sub-Class were deprived of the benefit of the bargain they reached at the time of purchase or lease.

309.   Defendants' failure to disclose and active concealment of the Defect in the Class Vehicles were material to Miles and Olivia McGregor and the Florida Sub-Class. A vehicle made by an honest and reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a dishonest and disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly reports on and remedies them.

310.   The McGregors and the Florida Sub-Class suffered ascertainable losses caused by Defendants' misrepresentations and their failure to disclose material information. Had Miles and Olivia McGregor and the Florida Sub-Class members been aware of the Defect that existed in the Class Vehicles and Defendants' complete disregard for the safety of its consumers, The McGregors and the Florida Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Miles and Olivia McGregor and the Florida Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

311.   Miles and Olivia McGregor and the Florida Sub-Class risk loss of use of their vehicles as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Caton, the Florida Class, and the public in general. Defendants' unlawful acts and practices complained of above affect the public interest.

312.   As a direct and proximate result of Defendants' violations of the FDUTPA, Miles and Olivia McGregor and the Florida Sub-Class have suffered injury-in-fact and/or actual damage, including the complete loss of their vehicles and the possessions inside of them.

313.   Miles and Olivia McGregor and the Florida Sub-Class are entitled to recover their actual damages, under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat § 501.2105(1).

314.   Miles and Olivia McGregor and the Florida Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**NINTH CAUSE OF ACTION**
**Breach of Warranty against Redhibitory Defects,**
**La. Civ. Code Ann. Art. 2520, 2524**
**(On behalf of the Louisiana Sub-Class against All Defendants)**

315.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 186 of this Complaint.

316.   Plaintiff Sandra Morgan brings this claim on behalf of herself and members of the Louisiana Sub-Class.

317.   Defendants are and were at all times relevant "sellers" with respect to motor vehicles under La. Civ. Code Ann. art. 2520, 2524.

318.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law

1    pursuant to La. Civ. Code Ann. art 2520, 2524.

2    319.   The Class Vehicles, when sold or leased and at all times thereafter,

3    were not in merchantable condition and are not fit for the ordinary purpose of

4    providing safe and reliable transportation. The Class Vehicles contain an

5    inherent Defect in their engines at the time of sale or lease and thereafter and

6    present an undisclosed safety risk to drivers, passengers, and other motorists.

7    Thus, Defendants breached the implied warranty of merchantability.

8    320.   At the time the members of the Louisiana Sub-Class acquired their

9    Class Vehicles, those vehicles had a rehibitory defect within the meaning of La.

10   Civ. Code Ann. art. 2520, in that (a) the Class Vehicles were rendered so

11   inconvenient that members of the Louisiana Sub-Class either would not have

12   purchased the Class Vehicles had they known of the Defect, or (b) because the

13   Defect so diminished the usefulness and/or value of the Class Vehicles such that

14   it must be presumed that Class members would have purchased the Class

15   Vehicles, but for a lesser price.

16   321.   Defendants were provided notice of the Defect by internal failure

17   mode testing, quality control audits, numerous consumer complaint to authorized

18   dealers nationwide, complaints to NHTSA and through other internal sources,

19   including but not limited to their own customer service hotlines.  Affording

20   Defendants a reasonable opportunity to cure their breach of implied warranties

21   would be unnecessary and futile here because Defendants have known of and

22   concealed the Defect and, on information and belief, have refused to repair or

23   replacement the defective Gamma engines and/or Class Vehicles free of charge

24   within a reasonable time.

25   322.   Defendants were further provided notice by Plaintiff Morgan of

26   their breach of warranties by letter dated August 7, 2020.  Despite this notice,

27   Defendants did not fully cure the breach of warranties and failed to provide a

28

1  suitable repair or replacement of her destroyed Class Vehicle free of charge
2  within a reasonable time.

3       323.   Defendants cannot disclaim their implied warranties as they
4  knowingly sold or leased a defective product.

5       324.   As a direct and proximate result of Defendants' breach of the
6  implied warranty of merchantability, Plaintiff Morgan and members of the
7  Louisiana Sub-Class have been damaged in amount to be proven at trial.

8       325.   Plaintiff Morgan and members of the Louisiana Sub-Class have
9  complied with all obligations under the warranty, or otherwise have been
10 excused from performance of said obligations as a result of Defendants' conduct
11 described herein.

12      326.   The Class Vehicles are not safe and reliable and owners and lessees
13 of these vehicles have lost confidence in the ability of Class Vehicles to perform
14 the function of safe reliable transportation without the likelihood of the Defect
15 causes excessive oil consumption, stalling, premature failure, or spontaneous
16 engine fires. Defendants are estopped by their conduct, as alleged herein, from
17 disclaiming any and all implied warranties with respect to the defective Gamma
18 engines in Class Vehicles.

19      327.   The Defect in the Class Vehicles renders their use so inconvenient
20 that Plaintiff Morgan and members of the Louisiana Sub-Class would not have
21 purchased or leased the Class Vehicle had they known of the Defect.
22 Accordingly, Plaintiff Morgan and the Louisiana Sub-Class are entitled to obtain
23 a recession of the sale of their Class Vehicles.

24      328.   Alternatively, the Defect diminishes the usefulness of the Class
25 Vehicles or their value so that Plaintiff Morgan and members of the Louisiana
26 Sub-Class would still have bought their Class Vehicles but for a lesser price.
27 Accordingly, Plaintiff Morgan and the Louisiana Sub-Class are entitled to obtain
28

1    a reduction of the price.

2        329.   The applicable period of prescription for the implied warranty claim

3    has been tolled by the discovery rule and Defendants' fraudulent concealment of

4    the Defect, as well as the terms of the express warranty.

5        330.   Pursuant to La. Civ. Code Ann. arts. 2531 and 2545, Plaintiff

6    Morgan and the Louisiana Sub-Class seek to recover the purchase price with

7    interest from the time it was price; or else the difference in value of the defective

8    Class Vehicles at the time of sale compared to their value warranted by

9    Defendants; reasonable expenses occasioned by the sales; reasonable attorneys'

10   fees; and any other just and proper relief available.

## TENTH CAUSE OF ACTION
**Violation of the Louisiana Product Liability Act,
La. Stat. Ann. 9:2800.51, *et seq.*
(On behalf of the Louisiana Sub-Class against All Defendants)**

14       331.   Plaintiffs incorporate by reference the allegations contained in

15   paragraphs 1 to 186 of this Complaint.

16       332.   Plaintiff Sandra Morgan brings this claim on behalf of herself and

17   the Louisiana Sub-Class.

18       333.   Defendants are "manufacturers" within the meaning of La. Stat.

19   Ann. 9:2800.53(1).

20       334.   Plaintiff Morgan and the Louisiana Sub-Class are "claimants"

21   within the meaning of La. Stat. Ann. 9:2800.53(4).

22       335.   Defendants placed the Class Vehicles into trade or commerce, which

23   are "products" within the meaning of La. Stat. Ann. 9:2800.53(3).

24       336.   The LPLA makes manufacturers liable for the damages caused by

25   their products which are "unreasonably dangerous" like one of four ways: (1) in

26   construction or composition; (2) design; (3) inadequate warning; and (4)

27   nonconformity to express warranty. LA. STAT. ANN. 9:2800.55-58.

28

337.   Defendants manufactured, sold and distributed the Class Vehicles, including the Gamma engines and their defects, which render the Class Vehicles unreasonably dangerous with an associated safety risk which can lead Class Vehicles to lose power, stall, or have an engine fire while driving, putting vehicle operators, passengers, and other motorists at risk for injury.  Plaintiff Morgan and the Louisiana Sub-Class used the Class Vehicles in a reasonably foreseeable manner by using the vehicles to transport themselves and others.

338.   The Gamma engines installed within the Class Vehicles are unreasonably dangerous in construction or composition because of the sudden loss of power, stalling, and engine fires does not meet performance standards for engines in any vehicle and deviates in a material from the manufacturer's specifications.  Furthermore, the Defect and its associated safety risk put drivers, passengers, and other motorists at risk for injury due to collisions and/or fires in the vehicle.  The performance standards for engines do not include the risk that they will consume excessive oil, stall or have fires while being driven and Defendants' specifications for the Class Vehicles do not include such a risk.

339.   The Class Vehicles are unreasonably dangerous due to the Defect and Defendants' failure to disclosure the Defect, its existence, and associated safety risk to Plaintiff Morgan and the Louisiana Sub-Class. At the time Plaintiff Morgan and the Louisiana Sub-Class purchased their Class Vehicles, Defendants knew, or should have known, that the Defect in the Class Vehicles could cause the engine to consume excessive oil, stall, lose power, and experience fires while being driven.  Further, Defendants knew, or should have known, that this associated safety risk would cause the Class Vehicles to become involved in accidents and/or be engulfed in flames, putting drivers, passengers, and other motorists at risk for injury.  However, Defendants provided no warnings or otherwise conveyed these risks to Plaintiff Morgan and the Louisiana Sub-Class.

340.   The Class Vehicles are also unreasonably dangerous because the existence of the Defect and its associated safety risk, and Defendants' failure to disclose either violates the express warranty Defendants provided that the Class Vehicles were safe, reliable, and functional vehicles capable of providing transportation, and that Defendants' industry-best warranty would correct any known defects in the Class Vehicles' manufacture, materials and/or workmanship.  Such warranties induced Plaintiff Morgan and members of the Louisiana Sub-Class to purchase the Class Vehicles.  These representations were untrue at the time of the purchase and/or lease of the Class Vehicles because Defendants knew that the Class Vehicles contained the Defect and associated safety risk.  Defendants' failure to provide Class Vehicles that conformed with their representations lead to the injuries sustained by Plaintiff Morgan and the Louisiana Sub-Class.

341.   Defendants knowingly concealed, suppressed and/or omitted the existence of the Defect and its associated safety risk in the Class Vehicles at the time of their sale or lease and at all relevant times thereafter.  Defendants failed to inform Plaintiff Morgan and the members of the Louisiana Sub-Class of the Defect in their Class Vehicles at the time of purchase or lease and all times thereafter and Plaintiff Morgan and the members of the Louisiana Sub-Class had no independent knowledge that the Class Vehicles incorporate the Defect.

342.   Had Defendants disclosed that the Class Vehicles had the Defect and associated safety risk, Plaintiff Morgan and the members of the Louisiana Sub-Class would not have purchased or leased the Class Vehicles or would have paid less for their vehicles.

343.   As a proximate and direct result of Defendants' conduct as described herein, Plaintiff Morgan and members of the Louisiana Sub-Class have suffered and continue to suffer harm by the loss of their vehicles, the threat of

sudden engine stalls and/or fires, and/or higher than expected maintenance costs based on Defendants' own estimates, actual costs and damages including costs of repair and expenses for obtaining alternative transportation, and other damages to be determined at trial. Plaintiff Morgan and members of the Louisiana Sub-Class have also suffered the ascertainable loss of the benefit of the bargain they reached at the time of purchase or lease, and diminished value of their Class Vehicles.

344.   The conduct of Defendants caused unavoidable and substantial injury to Class Vehicle owners and lessees (who were unable to have reasonably avoided injury due to no fault of their own and Defendants' concealment of the Defect) without any countervailing benefit to consumers.

345.   The applicable period of prescription of the LPLA has been tolled by the discovery rule, fraudulent concealment, and the terms of the express warranty.

346.   Pursuant to La. Civ. Ann. art. 2315, Plaintiff Morgan and the Louisiana Sub-Class seek to recover compensatory damages for past and future harms in an amount to be determined at trial; and any other just and proper relief available.

## ELEVENTH CAUSE OF ACTION
### Violation of the Missouri Merchandising Practices Act,
### Mo. Rev. Stat. § 407.010, *et seq*.
### (on behalf of the Missouri Sub-Class against all Defendants)

347.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 to 186 of this Complaint.

348.   Plaintiffs Christina and Seth Martin bring this claim on behalf of themselves and the Missouri Sub-Class.

349.   Plaintiffs Christina and Seth Martin, the members of the Missouri Sub-Class and Defendants are "persons" within the meaning of Mo. Rev. Stat. §

1   407.020.

2       350.   The Class Vehicles are "merchandise" within the meaning of Mo.

3   Rev. Stat. § 407.010(4).

4       351.   Defendants were and are engaged in "trade" or "commerce" within

5   the meaning of Mo. Rev. Stat. § 407.010(7).

6       352.   The Missouri Merchandising Practices Act ("Missouri MPA")

7   prohibits the "act, use or employment by any person of any deception, fraud,

8   false pretense, misrepresentation, unfair practice, or the concealment,

9   suppression, or omission of any material fact in connection with the sale or

10  advertisement of any merchandise." MO. REV. STAT. § 407.020.

11      353.   In the course of Defendants' business, Defendants violated the

12  Missouri MPA by failing to disclose and actively concealing that the Class

13  Vehicles possessed the Defect and its associated safety risk, by marketing their

14  Class Vehicles as safe and of high quality, and by presenting themselves as

15  reputable manufacturers and distributors that value safety and stood behind their

16  vehicles after they were sold.

17      354.   Specifically, in marketing, offering for sale, and selling the

18  defective Class Vehicles, Defendants engaged in one or more of the following

19  unfair or deceptive acts or practices proscribed by the Missouri MPA:

20  representing the Class Vehicles have characteristics or benefits they do not have;

21  representing they are of a particular standard and quality when they are not;

22  and/or advertising them with the intent not to sell them as advertised.

23      355.   Defendants have known or should have known for years of the

24  Defect in the Class Vehicles and failed to disclose and actively concealed the

25  associated safety risks posed by the Class Vehicles. Defendants also knew they

26  were manufacturing, selling, and distributing Class Vehicles that did not perform

27  as advertised and jeopardized the safety of the vehicle's occupants but failed to

28

1  disclose this information to Plaintiffs Christina and Seth Martin and members of
2  the Missouri Sub-Class.

3       356.   By failing to disclose and by actively concealing the Defect in the
4  Class Vehicles, by marketing them as safe, reliable, and of high quality, and by
5  presenting themselves as reputable manufacturers and distributors that value
6  safety, Defendants engaged in unfair or deceptive business practices in violation
7  of the Missouri MPA.  Defendants deliberately withheld the information about
8  the propensity of the defective engine to stall or start a fire in order to ensure that
9  consumers would purchase the Class Vehicles.

10      357.   In the course of Defendants' businesses, they willfully failed  to
11  disclose and actively concealed the associated safety risk of the Defect as
12  discussed above and otherwise engaged in unlawful trade practices by employing
13  deception, deceptive acts or practices, fraud, misrepresentations, or concealment,
14  suppression, or omission of the material facts concerning the Class Vehicles'
15  Defect and correspondingly safety risk with intent that others rely upon such
16  concealment, suppression, or omission, in connection with the sale of the Class
17  Vehicles.

18      358.   Defendants fraudulently, intentionally, negligently and/or recklessly
19  misrepresented to Plaintiffs Christina and Seth Martin and members of the
20  Missouri Sub-Class that the Class Vehicles were capable of providing safe,
21  reliable transportation and that the engines within the vehicles were high quality,
22  functional, and safe.

23      359.   Defendants fraudulently, intentionally, negligently and/or recklessly
24  misrepresented to Plaintiffs Christina and Seth Martin and the members of the
25  Missouri Sub-Class the characteristics of the Class Vehicles' engines with
26  respect to manufacture, workmanship, durability, functionality, maintenance, and
27  safety.

28

360.   Defendants intended that Plaintiffs Christina and Seth Martin and members of the Missouri Sub-Class would, in the course of their decisions to expend money in purchasing, leasing and/or repairing Class Vehicles, reasonably rely upon misrepresentations, misleading characterizations and material omissions concerning the quality of Class Vehicles engines with respect to workmanship and/or manufacture.

361.   Information regarding the Defect as described herein is material to consumers in that defects results in stalls and engine fires while driving, which cause serious safety risks.  As alleged above, Defendants made material statements and omissions about the safety and reliability of the Class Vehicles that were either false or misleading.

362.   If Defendants had not concealed the Defect from Plaintiffs Christina and Seth Martin and members of the Missouri Sub-Class within the express warranty period, the Defect could have been repaired without cost to purchasers as promised under the original warranty.

363.   To protect their profits and to avoid remediation costs and negative press, Defendants concealed the dangers and risks posed by the Class Vehicles and the associated safety risk of the Defect, and allowed new and used car purchases to continue to buy and/or lease the Class Vehicles and allowed them to continue to drive the dangerous vehicles.

   a. Defendants owed Plaintiffs Christina and Seth Martin and members of the Missouri Sub-Class a duty to disclose the true quality, safety, functionality, and reliability of the Class Vehicle because Defendants:

   b. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   c. Intentionally concealed the foregoing from Plaintiffs Christina

1    and Seth Martin and the members of the Missouri Sub-Class that

2    contradicted these representations.

3    364.   Defendants violated the Missouri MPA by failing to inform Class

4    Vehicles owners prior to purchase and/or during the warranty period that Class

5    Vehicle engines were defectively manufactured and/or suffered from

6    workmanship defect that posed an associated safety risk.

7    365.   Defendants violated the Missouri MPA by failing to inform Class

8    Vehicles owners prior to purchase and/or during the warranty period that Class

9    Vehicles engines contained defendants and would require repair and/or

10   replacement.

11   366.   As a proximate and direct result of Defendants' unfair and deceptive

12   trade practices, Plaintiffs Christina and Seth Martin and members of the Missouri

13   Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss

14   and financial harm.

15   367.   Plaintiffs Christina and Seth Martin and members of the Missouri

16   Sub-Class experienced ascertainable losses caused by Defendants'

17   misrepresentations and their failure to disclose material information about the

18   Defect and its associated safety risk in the form of engine stalls and fires, failure

19   to receive the benefit of their bargains, diminution of Class Vehicle resale value,

20   increased costs, and substantially property and monetary damages.

21   368.   Had they been aware of the existence and extent of the Defect in

22   Class Vehicles, and Defendants' disregard for safety, Plaintiffs Christina and

23   Seth Martin and the members of the Missouri Sub-Class would have either paid

24   less for their Class Vehicles or would have purchased or leased them at all.

25   Plaintiffs Christina and Seth Martin and the members of the Missouri Sub-Class

26   had no way of discerning the Defendants' representations were false and

27   misleading or otherwise learning the facts that Defendants had concealed or

28

1   failed to disclose.

2        369.   As a direct and proximate result of Defendants' violations of the

3   Missouri MPA, Plaintiffs Christina and Seth Martin and the members of the

4   Missouri Sub-Class have suffered injury-in-fact and/or actual damages.

5        370.   Defendants are liable to Plaintiffs Christina and Seth Martin and the

6   Missouri Sub-Class for damages in amounts to be proven at trial, including

7   attorneys' fees, costs, punitive damages, and any other just and proper relief

8   available under Mo. Rev. Stat. § 407.025.

**TWELFTH CAUSE OF ACTION**
**Violation of the Virginia Consumer Protection Act,**
**Va. Code Ann. § 59.1-196, *et seq*.**
**(On behalf of the Virginia Sub-Class against All Defendants)**

12        371.   Plaintiffs incorporate by reference the allegations contained in

13   paragraphs 1 to 186 of this Complaint.

14        372.   Plaintiff Dorothy Rice brings this claim on behalf of herself and the

15   Virginia Sub-Class.

16        373.   Plaintiff Rice, the members of the Virginia Sub-Class, and

17   Defendants are "persons" as defined by Va. Code Ann. § 59.1-198.

18        374.   The sale or lease of the Class Vehicles Plaintiff Rice and members

19   of the Virginia Sub-Class were for personal, family or household purposes and

20   are "consumer transaction[s]" as defined by Va. Code Ann. 59.1-198.

21        375.   The Class Vehicles are "goods" as defined by Va. Code Ann. §

22   59.1-198.

23        376.   Defendants are a "supplier" as defined by Va. Code Ann. § 59.1-

24   198.

25        377.   Defendants violated the Virginia Consumer Protection Act

26   ("VCPA"), Va. Code Ann. § 59.1-200(A), by *inter alia*: (1) "[m]isrepresenting

27   that the Class Vehicles have certain quantities, characteristics, ingredients, uses,

28

or benefits; (2) "[m]ispresenting that the goods or services are of a particular standard, quality, grade, style, or model;" (3) "[a]dverting goods or services with the intent not to sell them as advertised;" and (4) "[u]sing any other deceptive, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

378.   In the course of their businesses, Defendants willfully failed to disclose and actively concealed the Defect and otherwise engaged in activities with a tendency or capacity to deceive as discussed herein. Defendant also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material facts with intent that others reply upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

379.   In violation of the VCPA, Defendants knowingly concealed, suppressed and/or omitted material facts regarding the Defect and corresponding safety hazard and misrepresented the standard, quality, or grade of the Class Vehicles, which directly caused harm to Plaintiff Rice and the Virginia Sub-Class.

380.   Defendants actively suppressed the fact that the engine in Class Vehicles is defective and presents a safety hazard as described herein because of workmanship and/or manufacturing defects. Further, Defendants employed unfair and deceptive trade practices to deny repair or replacement of the defective engines within a reasonable time in violation of the VCPA. Defendants also breached their warranties as alleged herein in violation of the VCPA.

381.   Defendants' unfair and deceptive trade practices were likely to deceive a reasonable consumer.  Plaintiff Rice and the members of the Virginia Sub-Class had no reasonable way to know that Class Vehicles contained engines

that were defective in workmanship and/or manufacture and posed a dangerous safety risk.  Defendants possessed superior knowledge as to the quality, characteristics, functionality, and safety of the Class Vehicles, including the Defect and associated safety risks, and any reasonable consumer would have relied on Defendants' misrepresentations and omissions as did Plaintiff Rice and the members of the Virginia Sub-Class.

382.   Defendants intentionally and knowingly misrepresented and omitted facts regarding the Defect and corresponding safety hazard with the intent to mislead Plaintiff Rice and the members of the Virginia Sub-Class.  Defendants knew, or should have known, that the engines in Class Vehicles had a defect that could manifest both within and without the periods of the manufacturer's warranties.  Defendants also knew, or should have known, that the Defect in the Class Vehicles could cause the vehicles to stall or have engine fires.  Further, Defendants knew or should have known that such issues would put vehicle operators, passengers and others at risk for injury and could cause the Class Vehicles to become involved in collisions or other accidents.

383.   Defendants owed a duty to disclose the Defect and its corresponding safety hazard to Plaintiff Rice and members of the Virginia Sub-Class because Defendants possessed superior and exclusive knowledge regarding the Defect. Rather than disclose the Defect, Defendants intentionally and knowingly concealed, suppressed and/or omitted material facts concerning the Defect so that Defendants could sell additional Class Vehicles and avoid the cost of repair or replacement.

384.   Additionally, once Defendants made representations to the public about safety, quality, functionality, and reliability, Defendants were under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated.

One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

385.   Defendants' unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Defect were intended to mislead consumers and misled Plaintiff Rice and the members of the Virginia Sub-Class.

386.   At all relevant times, Defendants' unfair and deceptive acts or practices, affirmative misrepresentation and/or omissions regarding the Defect and its corresponding safety risks were material to Plaintiff Rice and the Virginia Sub-Class members.  When Plaintiff Rice and the members of the Virginia Sub-Class purchased or leased their Class Vehicles, they reasonable relied on the reasonable expectation that the Class Vehicles would be free from safety defects, pose an unavoidable safety hazard, and/or had engines that would not suddenly stall while in motion.  Plaintiff Rice and the members of the Virginia Sub-Class would have purchased or leased their Class Vehicles, or would have paid less for their vehicles, if they had been aware of the Defect and its corresponding safety risks.

387.   Defendants had a continuous duty to Plaintiff Rice and members of the Virginia Sub-Class to refrain from unfair and deceptive practices under the VCPA and to disclose the Defect and its corresponding safety hazards. Defendant's unfair and deceptive acts or practices, affirmative misrepresentations and/or material omissions regarding the Defect and corresponding safety hazards are substantially injurious to consumers.  As a result of Defendants' knowing, intentional concealment and/or omission of the Defect and corresponding safety hazards in violation of the VCPA, Plaintiff Rice and the members of the Virginia Sub-Class have suffered harm and/or continue to suffer harm by the threat having vehicles which can stall or have an engine

fire.  Owners and lessees of Class Vehicles also suffered an ascertainable loss of the benefits of the bargain they reached at the time of purchased or lease, and diminished value of their vehicles as a result of Defendants' deceptive and unfair acts and practices in the course of their businesses.

388.   Defendants have knowingly and willfully engaged in the unfair and deceptive trade practices alleged herein.  Further, Defendants unconscionably marketed the Class Vehicles to uninformed consumers in order to maximize profits by selling additional Class Vehicles containing the undisclosed Defect and corresponding safety hazards.

389.   Defendants' deceptive acts or practices occurred in the conduct of trade or commerce.  Defendants knew or should have known that its unlawful conduct violated the VCPA.

390.   Defendants' unlawful acts and practices affect the public interest, and trade and commerce in the State of Virginia, and present a continuing safety hazard to Plaintiff Rice and members of the Virginia Sub-Class.

391.   As a direct and proximate result of Defendant's violations of the VCPA, Plaintiff Rice and members of the Virginia Sub-Class have suffered actual damages and/or injury in fact, including, *inter alia*: (1) complete loss of use of vehicles destroyed by fires; (2) deprivation of the benefit of the bargain at the time of purchase or lease, including the difference in value between the Class Vehicles promised and warranted, and the Class Vehicles containing the Defect; and/or (3) the diminished resale value of the Class Vehicles containing the Defect.

392.   Plaintiff Rice and the members of the Virginia Sub-Class seek actual damages against Defendants in an amount to be determined at trial and/or statutory damages pursuant to the VCPA based Defendant's wanton and willful conduct, costs, attorneys' fees, restitution, disgorgement of funds, and any other

1   just and proper relief available under the VCPA.  *See* VA. CODE ANN. § 59.1-

2   204.

3                              **RELIEF REQUESTED**

4        393.   Plaintiffs, on behalf of themselves and all others similarly situated,

5   request the Court to enter judgment against Defendants, as follows:

6            (a)    An order certifying the proposed Class and Sub-Classes,

7                   designating Plaintiffs as representative of the Class, and

8                   designating the undersigned as Class Counsel;

9            (b)    A declaration that Defendants are financially responsible for

10                  notifying all Class Members about the defective nature of the

11                  system, including the need for repairs;

12           (c)    An order enjoining Defendants from further deceptive

13                  distribution, sales, and lease practices with respect to Class

14                  Vehicles; compelling Defendants to issue a voluntary recall for

15                  the Class Vehicles pursuant to 49 U.S.C. § 30118(a);

16                  compelling Defendants to remove, repair, and/or replace the

17                  Class Vehicles' with suitable alternative product(s) that do not

18                  contain the defects alleged herein; enjoining Defendants from

19                  selling the Class Vehicles with the misleading information;

20                  and/or compelling Defendants to reform the warranty, in a

21                  manner deemed to be appropriate by the Court, to cover the

22                  injury alleged and to notify all Class Members that such

23                  warranty has been reformed;

24           (d)    An award to Plaintiffs and the Class for compensatory,

25                  exemplary, and statutory damages, including interest, in an

26                  amount to be proven at trial.

27

28

(e)     A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of its Class Vehicles or make full restitution to Plaintiffs and Class Members;

(f)     An award of attorneys' fees and costs, as allowed by law;

(g)     An award of pre-judgment and post-judgment interest, as provided by law;

(h)     Leave to amend the Complaint to conform to the evidence produced at trial; and

(i)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

394.    Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs demand a trial by jury of all issues in this action so triable.

Dated:  October 30, 2020              Respectfully submitted,


By: /s/*Craig C. Marchiando*

**CONSUMER LITIGATION ASSOCIATES, P.C.**
Craig C. Marchiando (SBN 283829)
Matthew J. Erausquin (SBN 255217)
700 South Flower Street
Suite 1000
Los Angeles, CA 90017
Tel: 703-273-7770
Fax: 888-892-3512
craig@clalegal.com
matt@clalegal.com

Leonard A. Bennett (*Pro Hac Vice*)
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tel: 757-930-3660
Fax: 757-257-3450
lenbennett@clalegal.com

**BERGER MONTAGUE PC**
Russell D. Paul (*Pro Hac Vice*)
Abigail J. Gertner (*Pro Hac Vice*)
1818 Market Street
Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
rpaul@bm.net
agertner@bm.net

*Attorneys for Plaintiffs and the Proposed Class*

FIRST AMENDED CLASS ACTION COMPLAINT